NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 388, Respondent.

No. 75–2152.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1976.

Decided Jan. 28, 1977.

Elliott Moore, Deputy Associate Gen. Counsel, Roger T. Brice, John E. Higgins, Jr., N. L. R. B., Washington, D. C., for petitioner.

Walter F. Kelly, Peter D. Goldberg, Milwaukee, Wis., for respondent.

Before FAIRCHILD, Chief Judge, and TONE and BAUER, Circuit Judges.

FAIRCHILD, Chief Judge.

This case is brought by the National Labor Relations Board seeking enforcement of its order of September 25, 1975, against the International Brotherhood of Electrical Workers Local Union No. 388. The Board has found the Union in violation of Section 8(g) of the National Labor Relations Act as a result of its picketing at St. Joseph's Hospital without first giving the ten day notices required by that section of the Act.[1] Its order requires Local 388 to cease and desist from this unfair labor practice and to post copies of a notice, signed by its authorized representative, at its business offices and meeting halls, assuring that no further violations of Section 8(g) will ensue. For the reasons set forth below, we have decided to deny the Board's request for enforcement of this order.

## The Picketing at St. Joseph's Hospital

St. Joseph's Hospital is a private non-profit hospital located in Marshfield, Wisconsin.[2] In 1974 the hospital contracted with Hoffman Company, Inc. for construction of a laboratory building to be connected to the main hospital facility by a common wall and corridor. In connection with the planned expansion, St. Joseph's executed a direct contract with Thomas Electrical Services, Inc. to perform all necessary electrical work on the laboratory project.

On or about February 11, 1975, members of Local 388 began an area standards picket action against Thomas, establishing two pickets at St. Joseph's Court, the hospital's delivery access street.[3] The picketing was thus on hospital property, directly across from the existing hospital building and di-

---

1. Section 8(g) of the National Labor Relations Act, 29 U.S.C. § 158(g), provides in pertinent part that:

   A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less then ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention . . . .

2. The facility qualifies as a "health care institution" under Section 2(14) of the National Labor Relations Act, 29 U.S.C. § 152(14), which provides that:

   The term health care institution shall include any hospital, convalescent hospital, health maintenance organization, health clinic, extended care facility, or other institution devoted to the care of sick, infirm or aged persons.

3. The picket signs carried by the Union members bore the legend:

   I.B.E.W.

rectly adjacent to a parking lot provided for the employees of the hospital. After approximately two hours, the Union moved the pickets from the delivery access street to the corner of a city street on the perimeter of hospital grounds. They remained at this location until approximately February 27, 1975, when they were moved back to their original position at the delivery access street. The picketing at this spot continued until April 15, 1975. As a result, employees of other contractors engaged in construction of the laboratory project at various times refused to work during the picketing. There is no allegation, however, that any hospital employees ceased work as a result of the picketing, or that the picketing had any adverse impact on the hospital's ability to provide its customary medical services. Picketing ultimately forced Thomas to cease all daytime operations and to limit its work on the jobsite to night time.

The Union's picketing was commenced and continued without the service of Section 8(g) notice upon either St. Joseph's Hospital or the Federal Mediation and Conciliation Service. On February 20, 1975, the Hoffman Company brought this fact to the attention of the Board in a charge filed against Local 388. The Union, which at this time was picketing on the city street corner at the hospital's perimeter, responded by writing to St. Joseph's on February 21, 1975, informing the hospital that it had no dispute with the health care institution and that the only purpose of the picketing was to publicize the substandard wages and benefits provided by Thomas. In its letter, the Union refused to concede the applicabil-

ity of Section 8(g) to its area standards picketing of Thomas but noted that, if there were any notice obligation under the Act, its failure to comply was strictly an oversight. Neither at this time, nor when the pickets were moved back to the delivery access street, nor at any time through April 15, however, did the Union serve formal 8(g) notice on the hospital or on the Federal Mediation and Conciliation Service. Thus, on April 1, 1975, the Hoffman Company filed another charge against Local 388 with the Board. The parties having stipulated to the above-outlined facts, the Board considered the case and, on September 25, 1975, issued the order against Local 388 that it now seeks to have enforced.

*The Applicability of Section 8(g) to the Union's Picketing at St. Joseph's Hospital*

The particular issue confronting the court in this case is one of statutory construction, specifically: When Section 8(g) requires ten day notices to be filed by "a labor organization . . . engaging in any strike, picketing, or other concerted refusal to work at any health care institution," does the section apply only to unions directing concerted activity at the health care institution, purportedly on behalf of the employees of the institution, or is it also applicable to unions such as Local 388 which represent employees of others, not involved in any dispute with a health care institution, but, whose labor activities take place on the premises of the institution?[4] There is much to be said for both views, but, in the end, we conclude that 8(g) does apply

International Broth. of Elec. Workers L. U. # 388

Our only dispute is with the substandard wage, substandard benefits paid to employees of Thomas Electric.

4. The resolution of this issue involves this court in its first interpretation of Section 8(g). In fact, it seems that no federal court has yet ruled on the scope of the applicability of 8(g). The Board itself, however, on two prior occasions, in 3 to 2 decisions, the reasoning in which has been incorporated by reference into the Board's instant order, ruled that the notice provision of 8(g) would apply to *any* labor union activity directed at *any* employer if the

activity took place on the premises of a hospital. See *United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry of the United States & Canada, Local 630, AFL–CIO (Lein-Steenberg)*, 219 NLRB No. 153, 89 LRRM 1770 (1975); *Laborers' International Union of North America, AFL–CIO, Local No. 1057 (Mercy Hospital of Laredo)*, 219 NLRB No. 154, 89 LRRM 1777 (1975). Review of both cases is currently pending in the D.C. Circuit (Nos. 75–1854 and 75–1859). We are not unmindful of the respect courts have often shown administrative agencies in their construction of statutes and regulations. See e. g., *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792,

only to unions representing health care institution employees.[5]

### A. *The Language of Section 8(g)*

We have considered a number of factors in reaching this conclusion, the first being the language of the amendment itself. In the briefs filed by the parties, there is much discussion of the plain meaning of Section 8(g) and particularly of the word "at" in the phrase, "engaging in any strike, picketing or other concerted refusal to work *at* any health care institution." The Board argues that "at" refers to the location of the labor activity with reference to the property of the health care institution, and therefore, that any strikes, picketing, etc., occurring on the premises of the institution by any union, regardless of the employer or labor dispute involved, should be covered. The Union's position, however, is that "at" refers to the target at which strikes, picketing, *etc.* are directed, so that only unions directing their protests against the health care institution, *i. e.*, only unions purportedly representing employees of the health care institution, should be covered.

Quite frankly, we find the language of the amendment equivocal, and cannot accept either of the positions outlined as the "plain meaning" of 8(g). While we believe the common understanding of the word "at" to be related to location, we do not believe the language of 8(g) offers much guidance in helping us decide whether the location we are to focus on is (1) the one where a labor activity takes places, or (2) the one where the persons on whose behalf the activity is undertaken are employed. When we read the phrase "picketing . . . at a health case institution," we tend to think in broad terms of physical activity taking place on the premises of a health care institution. But, when we read the phrase "strike . . . at a health care institution" or "refusal to work at a health care institution," we tend to think more narrowly of activity involving a group of employees and the health care institution that employs them. We do not, however, believe that the sentence structure of 8(g) will tolerate an interpretation of the word "at" that shifts the location meant from place of employment to place of activity and back again. The preposition serves as a common link between all three forms of labor protest and the health care institution involved,[6] and thus, we believe, must have a

13 L.Ed.2d 616 (1964). But, as Professor Davis has noted, courts just as often substitute their judgment for that of agencies, particularly when the issues involved "govern whole classes of cases instead of those that affect only individual cases." *See generally* K. Davis, *Administrative Law Treatise* §§ 30.07–30.14. We believe this to be such a case. The construction given "strike, picketing or refusal to work at a health care institution," which does not depend on the facts in this particular case, will create or eliminate a whole class of potential 8(g) cases. *Cf. Office Employees v. NLRB*, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957) (in which the Court readily substituted its judgment for that of the Board on the general question of whether a labor organization which has employees is an "employer" under the Act.) Moreover, despite the deference to be given administrative agencies, a court may not abdicate its independent responsibility to construe statutory language. *See FTC v. Miller*, 549 F.2d 452 at 457 (7th Cir. 1977), and cases there cited.

5. The facts of the instant case do not require us to reach the issue of whether employees en-

gaged in work activities necessary to the present operation of a health care institution, but not employed directly by the institution, should be deemed health care employees. The parties are in apparent agreement that the activities of the employees involved in the instant case were in no way necessary to the present delivery of health care by St. Joseph's Hospital.

6. This court cannot accept the position of the dissenting board members in the *Lein-Steenberg* and *Mercy Hospital of Laredo* cases, *supra,* note 4, to the effect that the preposition "at," when used in Section 8(g), was meant to apply only to the last-mentioned labor activity, *i. e.*, "refusal to work at." They explained:

One can "picket" a health care institution but not "refuse to work a health care institution." Thus, if Congress had chosen not to include a prohibition against "other concerted refusals to work" but had limited itself to prohibiting striking and/or picketing, the word "at" would not be necessary.

But 8(g) does not use the term striking or picketing a health care institution. The section refers to "engaging in any strike, picketing, or

common meaning applicable in all three contexts.

It accordingly proved necessary for the court to look outside the statutory language for guidance in choosing a uniform meaning for the word "at," and thereby in determining the scope of union activity covered by Section 8(g).

### B. *The Legislative History*

■ At the urging of the parties, we have considered the legislative history of the hospital amendments in general, and of Section 8(g) in particular. It seems clear that these amendments to the National Labor Relations Act, enacted on July 26, 1974,[7] had as their primary purpose the inclusion of non-profit hospitals and their employees within the terms of the Act.[8] Section 8(g) suggests the further concern of assuring continued patient care during labor disputes at a health care institution. It would be neatly consistent with the overall purpose of extending the protection of the National Labor Relations Act to employees of health care institutions to read this section as an attempt to regulate the newly-protected concerted activity of such employees in order to alleviate any disruption of health care resulting from such activity. It is not nearly so explainable why regulation would be extended to activity engaged in by the

employees of other than the institution, activity already protected by the Act prior to passage of the health care institution amendments.

Section 8(g) made its first appearance in a 1973 proposal by Senator Taft.[9] In that version, the amendment would have (1) prohibited strikes, picketing or lockouts by "a health care institution" or "a labor organization which is the bargaining representative of its employees" when a collective bargaining agreement was in effect between the two unless certain conditions were met including service of a ten-day notice of proposed action on the hospital or labor organization and the Mediation and Conciliation Service, (2) required the same procedures as a requisite to any strikes, picketing or lockouts when "a health care organization" and "a labor organization which is the bargaining representative of its employees" enter into negotiations for an initial collective bargaining agreement, and (3) made it an unfair labor practice for "any labor organization" to induce, sanction or participate in (a) any strike or work stoppage . . . "against" a health care institution, or (b) any picketing . . . "of" or "at the premises of" a health care institution, except as permitted in the two aforementioned sections. The Board would have this court find in this proposed formu-

---

other concerted refusal to work at a health care institution." While one can indeed "strike a health care institution," or be "picketing a health care institution," one cannot be "engaging in any strike . . . a health care institution" or be "engaging in any picketing . . . a health care institution." As Section 8(g) is written then, each of the three labor activities therein described needs to be followed by the preposition "at" to link it in some way to "a health care institution."

7. Pub.L. No. 93–360 (93d Cong. S. 3203, July 26, 1974), 29 U.S.C. §§ 152, 158, 168, 169.

8. The Board had originally assumed jurisdiction over nonprofit hospitals. *See The Central Dispensary & Emergency Hospital,* 44 NLRB 533 (1942), *enforced,* 79 U.S.App.D.C. 274, 145 F.2d 852 (1944), *cert. denied,* 324 U.S. 847, 65 S.Ct. 684, 89 L.Ed. 1408 (1945). But in 1947, the Taft-Hartley Amendments to the Wagner Act specifically excluded such hospitals from the term "employer" and hence, from the Act. The rationale was that such institutions were

primarily community-oriented charities not engaged in interstate commerce. As nonprofit hospitals grew into major business enterprises, however, with revenues of almost $19 billion and employees numbering 1½ million. Congress began to rethink its position. *See* 120 Cong.Rec. 12937–38 (1974) (remarks of Sen. Williams); 120 Cong.Rec. 12941 (1974) (remarks of Sen. Taft); Vernon, *Labor Relations in the Health Care Field under the 1974 Amendments to the National Labor Relations Act: An Overview and Analysis,* 70 Nw.L.Rev. 202, 203 (1975). Thus, beginning in 1972, bills were introduced to eliminate the non-profit exemption. *See* H.R. 11357, 92d Cong., 2d Sess. (1972); H.R. 1236, 93d Cong., 1st Sess. (1973); S. 794, 93d Cong., 1st Sess. (1973); S. 2292, 93d Cong., 1st Sess. (1973); S. 3088, 93d Cong., 2d Sess. (1974); S. 3203, 93d Cong., 2d Sess. (1974); H.R. 13678, 93d Cong., 2d Sess. (1974).

9. S. 2292, 93d Cong., 1st Sess. (1973).

lation of Section 8(g) clear evidence of Congressional intent to limit labor activity by non-health care institution employees as well as health care institution employees insofar as that activity in some way relates to the hospital. It contrasts the identification of particular labor disputants in regulatory subsections (1) and (2) of the proposal, making them applicable only to activity between "a health care institution" and "a labor organization which is the bargaining representative of its employees," with the absence of any such limiting language in subsection (3)'s proscription of any other strike, picketing or work stoppage. Moreover, it calls attention to the careful inclusion in the subsection (3) proscription of strikes and work stoppages "against" or picketing "of" the health care institution—all concerned with the institution as target—*and* of picketing "at the premises of" the institution—concerned simply with the institution as the situs of the labor activity. The Board then argues that the present Section 8(g) reflects a compromise in that Congress no longer proscribes labor activity by non-health care employees directed against or occurring at the premises of a health care institution. Rather, it now regulates such activity to the same extent it does labor activity engaged in by employees of a health care institution.

We believe this to be the Board's strongest argument, and yet we must reject it. For if Congressional intent in changing from the 1973 proposed version of 8(g) to the enacted 8(g) were as the Board would have us believe, we would expect that somewhere in the Congressional hearings and debates on the hospital amendments we would find some discussion of whether la-bor activity by non-health care employees related to a health care institution should be proscribed or merely regulated. We have examined the debates and hearings and find no such discussion. Indeed, we are struck by the complete absence anywhere in the not insubstantial legislative history of any reference whatsoever to labor activity involving non-health care employees.

■ The Union does not dispute that the present 8(g) is indeed a compromise focusing on regulation of labor activities related to health care institutions rather than proscription. But, it argues that the 1973 version of 8(g), insofar as it proscribed some activity, was, even in that context, meant to apply only to such activity as was engaged in by health care institution employees.[10] We believe that despite the general language of subsection (3), in contrast to subsections (1) and (2), the legislative history does offer some support for this position.[11]

For example, statements in the Senate debate on regulation versus proscription focus exclusively on labor activity engaged in by health care employees. Senator Javits, one of the sponsors of the presently enacted hospital amendments, in the course of the debates, stated that he had "explored intensively the question of whether any further limitation should be placed on the union's right to strike health care institutions." 120 Cong.Rec. 12939 (1974). But as his statements, in the following colloquy with Senator Cotton show, the only unions with which he proved to be concerned were those representing health care employees.

> Mr. Javits: . . . Mr. President, I am very pleased to present to the Senate today letters . . . from the four

---

**10.** In short, the Union suggests that the 1973 version of 8(g) was meant to allow labor activity between "a health care institution" or "a labor organization which is the bargaining representative of its employees" when (1) a collective bargaining agreement was in effect between the two, or (2) when such an agreement was being negotiated, if certain conditions were met. If a labor dispute between the *same parties* were to arise in a different context, the Union argues that subsection (3) was meant to stand for the Congressional determination that such would be considered an unfair labor practice.

**11.** This is not to say that the support we find is particularly strong; only that it is more persuasive than that which the Board points to. Moreover, we believe that in a case such as this, where the Board is arguing for a narrowing of recognized labor rights, it has the burden of showing that such narrowing was the intent of Congress.

major trade unions involved in organizing hospital workers. They have assured me in writing that they endorse the use of voluntary arbitration to settle labor-management disputes which threaten to disrupt essential health services.[12]

\*     \*     \*     \*     \*     \*

Mr. Cotton: Are those four labor organizations all of the labor organizations that deal with these hospital workers?

Mr. Javits: Mr. President, I would be very careful not to say all because I am always very careful about statements of fact, but they are the primary trade unions in the field.

Mr. Cotton: Any other labor organization involved would be comparatively small?

Mr. Javits: Exactly. . . .

120 Cong.Rec. 12939–40 (1974). We are of the opinion that if the Board were right that Congress, in changing the 1973 version of 8(g) to the presently-enacted version, had had as its primary intention the regulation rather than proscription of non-health care employees' labor activities, we would not find in the debates discussions, such as that cited, focusing exclusively on the activities of health care employees.

This narrowly-focused concern is further evidenced in the Senate and House Reports on Section 8(g). The reports predict two instances when 8(g) notice will not be required.

(1) . . . a labor organization will not be required to serve a ten-day notice . . . when the employer has committed unfair labor practices . . . .

(2) Moreover, . . . the employer should remain free to take whatever action is necessary to maintain health care, but not to use the ten-day period to undermine the bargaining relationship that would otherwise exist. For example, the employer

would not be free to bring in large numbers of supervisory help, nurses, staff and other personnel from other facilities for replacement purposes. It would clearly be free to receive supplies, but it would not be free to take extraordinary steps to stock up on ordinary supplies for an unduly extended period. While not necessarily a violation of the Act, violation of these principles would serve to release the labor organization from its obligation not to engage in economic action during the course of the ten-day notice period.

S.Rep. 93–766, 4–5 (1974); H.R.Rep. 93–1051, 6 (1974), U.S.Code Cong. & Admin. News 1974, pp. 3946, 3949. While these reports refer generally to "a labor organization," the context makes clear that the only labor organizations intended were those representing health care institution employees. For certainly, the general term "employer" refers only to the health care institution. It would make no sense to read the first predicted exemption as meaning that if, in the instant case, Thomas Electrical were guilty of an unfair labor practice such third-party wrongdoing would constitute grounds to punish St. Joseph's by depriving it of notice of proposed labor activity. The exemption only makes sense if the wrongdoing is on the part of the health care institution itself. The second exemption only adds support to this view. For an employer such as Thomas would have no interest whatsoever in maintaining health care, or in bringing in nurses and other staff. Only if "employer" is read to mean "health care institution" does the exemption have any logical meaning. If the only sensible meaning of "employer" in the Congressional reports is health care institution, then the only sensible meaning of "a labor organization" is one representing the employees of a health care institution. Congress having intended such general words to have such specific meanings when they

---

12. At this point, Senator Javits read letters from the Presidents of the National Union of Hospital and Nursing Home Employees, the Teamsters, the Service Employees International Union and the Laborers International Union. 120 Cong.Rec. 12939–40 (1974).

used them in reporting on Section 8(g), we believe that the same specific meaning was intended when the words were used in the statute itself.[13]

## C. *The Interaction of Section 8(g) with Other Hospital Amendments*

In considering the scope of applicability of Section 8(g), we have found it useful to consider the amendment, not simply in isolation but, in conjunction with those other laws with which it must interact. Most significant in this regard is Section 8(d)(1) which describes the powers of the Federal Mediation and Conciliation Service in terms that make clear the Service's powers are limited to situations involving employees of a health care institution.[14]

Thus, were we to accept the Board's interpretation of Section 8(g), we would be ascribing to Congress the intention of requiring any labor organization contemplating activity at a health facility to serve ten-day notice on the Federal Mediation and Conciliation Service, though 8(d)(1) makes clear that the FMCS would be powerless to require meetings between the disputing parties unless employees of a health care institution were involved. We cannot believe such to have been the intent of Congress, and accordingly must interpret Section 8(g) as requiring notice of proposed labor activity, both to the FMCS and the health care institution, only when such activity is planned on behalf of employees of the institution.

## D. *Conclusion*

We have not, thus far, discussed the Board's argument that the object of Congressional concern in enacting Section 8(g) was "to insure the continuity of health care to the community and the care and well being of patients." S.Rep. 93–766 (1974); H.R.Rep. 93–1051 (1974), U.S.Code Cong. & Admin.News 1974, p. 3949, or its conclusion that notice to the institution of any proposed labor activity, either directed at it by its own employees or occurring on its own premises though directed at a third party, is necessary to assure attainment of this purpose. We do not dispute that the Board has properly identified the Congressional goal to be attained through Section 8(g). But we note again that the overall purpose of the hospital amendments was to extend National Labor Relations Act protection to employees of health care institutions and that the principal concern of Congress with this change, as evidenced by the debates, was with the potential for increased disruption of health care delivery resulting from increased labor activity by employees of health care institutions now that their activities were protected. The amendments do not, however, affect employees of other than health care institutions. Accordingly, they create no increased danger of health care delivery disruption by these employees. We do not believe that Congress intended to extend the increased regulation of Section 8(g) to areas of labor activity that did not pose such increased danger as a result of the enactment of the hospital amend-

---

**13.** Though we generally hesitate to ascribe much weight to subsequent Congressional expressions of intent, *see United States v. Philadelphia National Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), we do note that Senator Taft, who is responsible for having introduced the original version of Section 8(g), into the hospital amendments, and who was a principal participant in the debates on the present version, has commented that it was never his intention to bring non-health care employees under the restrictions of Section 8(g). 121 Cong.Rec. S. 20466 (daily ed. Nov. 19, 1975). *Contra* 121 Cong.Rec. E. 6774 (daily ed. Dec. 19, 1975) (comments of Representative Quie).

**14.** Section 8(d)(1) provides in pertinent part:

Whenever the collective bargaining involves *employees of a health care institution,* the provisions of this section 8(d) shall be modified as follows:

\* \* \* \* \* \*

(C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute. (Emphasis added.)

ments. And so we cannot join in the Board's conclusion.[15]

We are mindful of the fact that a ten-day notice requirement is not an oppressive burden to place on a union. But we are also aware that any regulation imposed on a union's ability to strike or picket deprives workers of important rights. Congress has made clear that as part of the price for giving to employees of health care institutions the benefits and protection of coverage under the National Labor Relations Act, unions representing such employees will have to serve ten-day's notice on the employer (and the FMCS) of any proposed labor activity. But we do not find a clear expression of intention to make this regulation applicable to unions whose activities on behalf of other employees were already covered by the National Labor Relations Act.

## ENFORCEMENT DENIED

---

15. We also believe there is an argument to be made that ten-day's notice of primary activity directed against a third party employer, taking place on the premises of a health care institution, is most unlikely to make any real difference in the provision of continuous patient care. We believe that most union activity by non-health care employees that does threaten continued health care will be such as to constitute illegal secondary activity already covered under Section 8(b)(4) of the Act. Admittedly, in the Senate Report on Section 8(g) there is mention in a footnote that one of the amendment's advantages is that its notice provision will allow for early detection of 8(b)(4) activity. S.Rep. 93–766, 4, n. 1 (1974), but the legislative history as a whole suggests that the secondary activity with which the Senate was concerned was that involving the employees of one health care institution, who would carry their protest against their own employer to the site of an institution to which their employer had moved patients.