**MARY THOMPSON HOSPITAL, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Local 399, International Union of Operating Engineers, Intervening Respondent.**

**No. 79–1374.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 27, 1979.

Decided March 5, 1980.

Robert S. Jacobs, Chicago, Ill., for petitioner.

Charles P. Donnelly, N.L.R.B., Washington, D. C., for respondent.

Before FAIRCHILD, Chief Circuit Judge, WISDOM, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

Mary Thompson Hospital, Inc. asks this court to review and set aside an order by the National Labor Relations Board (Board), requiring it to bargain with Local 399, the elected bargaining representative for four of its 410 employees. The Hospital argues that, contrary to the Board's determination that four licensed stationary engineers constitute an appropriate bargaining unit, the establishment of a separate bargaining unit for those employees violates the congressional admonition against an undue proliferation of bargaining units in the health care industry. The Board cross-petitions for, and the Union requests as intervenor, enforcement of the Board's order directing the Hospital to bargain with the Union. After examining the briefs and record in this case and in light of the abundant authority requiring the Board to consider the congressional admonition, we set aside and deny enforcement of the Board's order.

---

* Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit is sitting by designation.

## I

Mary Thompson Hospital, Inc. is a non-profit health care facility with 410 employees. Since 1972, the Hospital Employees Labor Program (HELP) has been the bargaining representative for a unit comprised of some of the Hospital's service, maintenance and technical employees. The current HELP bargaining agreement, effective until March 31, 1981, covers approximately 135 of the Hospital's employees, and includes all housekeeping employees, licensed practical nurses, nurses' assistants, dietary and general maintenance employees but excludes all regularly scheduled employees working less than twenty (20) hours per week, or casual employees, guards, student nurses, · engineers, licensed maintenance men, licensed and/or certified employees and supervisors and all other hospital employees. Joint Appendix at 78.

The focus in this controversy is on four licensed stationary engineers (LSEs) who are not covered by the HELP contract and who are part of the Maintenance and Engineering Department of the Hospital. That Department consists of five other employees, a painter and four maintenance workers, who are covered by the HELP contract, and of two supervisors who are expressly excluded from the contract.

The Maintenance and Engineering Department operates seven days a week, with three shifts a day. One stationary engineer is on duty for each shift. The LSE's job description reads as follows:

### JOB SUMMARY

Operates and maintains one or more coal, gas or oil-fired boiler, and such auxiliary equipment as steam engine, air compressors, and generators, to provide steam, electric power, and auxiliary services. Observes meters and gauges to determine operating condition of equipment and to regulate flow of water and fuel in accordance with needs and safety standards. Adjusts and repair [sic] equipment. Records such data as hours of operation, temperature and pressure, and fuel consumption, in a log.

### QUALIFICATIONS

*Education* : Ability to read and write, make arithmetical computations, and follow complex instructions. Courses include general science, physics, mechanical drawing, steam powered equipment, blueprint reading, operation of boilers of various horsepower, steampipe connections, methods of fixing, safety requirements, cleaning of flues, and making minor repairs.

*Training and Maintenance* : Worker must have progressive experience as a fireman, stationary boiler and in tending various types of smaller and lower pressure boilers before qualifying for tending boilers of specific horsepower and pressure. Local or state license is usually required for specific class of equipment operated. Up to three years experience may be required.

*Job Knowledge* : Must be thoroughly familiar with fixing, operating and repairing steam boilers and auxiliary equipment, and be able to read and interpret blueprints and technical specifications. May be required to operate and repair specialized equipment, such as air conditioning, refrigeration, and water-purifying equipment.

Joint Appendix at 94–95.

On June 28, 1978, Local 399, International Union of Operating Engineers, petitioned the Board to represent a unit consisting of the four LSEs. The Hospital opposed the formation of a separate bargaining unit for the LSEs, arguing that such a unit violated the congressional admonition against the undue proliferation of bargaining units in the health care industry. After reviewing the record of a hearing on the issue, National Labor Relations Board Regional Director Alex Barbour identified a number of factors which distinguished LSEs from other Hospital employees. Stating that the LSEs were separately located, were required to be licensed, performed a highly specialized function, and had minimal contact with the other nonprofessional employees who were

not covered by the HELP agreement, he concluded that the LSEs enjoyed a separate community of interest and therefore constituted an appropriate separate bargaining unit. He did not analyze the issue in terms of the congressional admonition. See *Mary Thompson Hospital*, No. 13–RC–14798 (N.L. R.B. Aug. 9, 1978) at 3.

The Hospital, represented by new counsel, moved for rehearing and reconsideration of the determination, but the motion was denied. Pursuant to the Board's decision, an election was conducted in which a majority of the LSEs voted to have Local 399 as their bargaining representative. Despite this election, the Hospital refused to recognize or bargain with the Union as the bargaining agent for the LSEs, maintaining its position that a separate unit consisting solely of the LSEs was inappropriate, both under the National Labor Relations Act (the Act) and case law.

On October 24, 1978, Local 399 filed charges with the Board, alleging that the Hospital was engaged in unfair labor practices. Consequently, on November 16, 1978, the Board issued to the Hospital a formal complaint and notice of hearing, asserting that the Hospital had violated the National Labor Relations Act. In a summary judgment, the Board concluded that the Hospital's refusal to bargain with the Union constituted an unfair labor practice within the meaning of sections 8(a)(5) and (1) of the Act, and it ordered the Hospital to cease and desist from its refusal to bargain collectively with the Union. See *Mary Thompson Hospital*, 241 N.L.R.B. No. 119 (1979). This appeal followed.

## II

Before 1974, the National Labor Relations Act did not include within its purview nonprofit hospitals like Mary Thompson. Finding "no acceptable reason" why the employees of these hospitals "should continue to be excluded from the coverage and protections of the Act," Congress removed the exemption in Public Law 93–360. S.Rep.No.93–766, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.

News 3946, 3948. However, Congress expressly recognized that "the needs of patients in health care institutions required special consideration . . . ." *Id.* Accordingly, in what has become known as the congressional admonition, Congress cautioned the Board to give due consideration to preventing the proliferation of bargaining units in the health care industry. *Id.* at 3950.

In *Shriner's Hospital*, 217 N.L.R.B. 806 (1975), one of the first cases decided after the 1974 amendment and one dealing specifically with the formation of a separate unit for stationary engineers, the Board did indeed give due consideration to the congressional admonition:

> In adopting the hospital amendments, Congress recognized that labor relations in the health care industry require special considerations due to the uniqueness of that industry in terms of the services it provides to the sick, infirm, or aged. It is in the context of the peculiar nature of the industry and the congressional mandate against the proliferation of bargaining units that we have weighed all of the criteria traditionally considered when making a unit determination and have, on balance, concluded that it is proper to place special significance on the high degree of integration of operations performed throughout a health care facility.
>
> *       *       *       *       *       *
>
> We shall not [find appropriate the formation of several separate units], because such an approach can only lead to an undue fragmentation of bargaining units in the health care industry which would totally frustrate congressional intent.

*Id.* at 808.

Unfortunately, in more recent cases, the Board has not so faithfully followed the congressional directive. Indeed, in analyzing the considerations for approving a separate unit in the present case, the Board did not even make a token mention of the congressional admonition. Nevertheless, in its brief in this court, the Board argues that its position is not contrary to *Shriner's*:

To be sure, in [*Shriner's* ] . . ., the Board appeared to adopt as a general rule that stationary engineer units would not be found appropriate in health care facilities because of the "high degree of integration of operations performed throughout" such facilities. [citation omitted] However, no clear majority of the full five-member Board endorsed the approach announced in *Shriner's*; indeed, the decision to establish a "*per se* rule" applicable to hospital engineer units had explicit support from only two Board members. [citation omitted] Furthermore, Member Penello, one member of the *Shriner's* majority, subsequently joined in finding appropriate a stationary engineer unit in *St. Vincent's Hospital*, 223 N.L.R.B. 638, 639 (1976).

\* \* \* \* \* \*

As the Board recently observed in *Allegheny General Hospital*, 239 N.L.R.B. No. 104, slip op. p. 6, 100 LRRM 1030, 1031–1032 (1978), Member Penello thus reflected the present majority's view; moreover, as stated in *Allegheny*, the "criteria traditionally considered" constitute the community of interest guidelines described above . . . which require examination on a case-by-case basis.

*Brief of the Board* at 12–13 [footnote omitted].

■■■■ Contrary to the position asserted by the Board, the proper focus in unit determinations in a hospital setting is *not* solely a traditional community of interest analysis. Indeed, in both *St. Vincent's Hospital* and *Allegheny General Hospital*, the two cases relied upon by the Board in support of its position, the Third Circuit reversed the Board's unit determinations because it had relied on that traditional standard without considering the congressional admonition. And as the court of appeals said in *Allegheny*:

[I]t is in this court by virtue of its responsibility as the statutory court of review of NLRB orders that Congress has vested a superior power for the interpretation of the congressional mandate. Congress has not given to the NLRB the power or authority to disagree, respectfully or otherwise, with decisions of this court.

*Allegheny General Hospital v. N. L. R. B.*, 608 F.2d 965, 970 (3d Cir. 1979). Therefore, we must look to decisions by courts of appeals—not to decisions by the Board—in determining how properly to consider the congressional admonition. As a review of the relevant cases will show, courts of appeals have consistently rejected a strict reliance on a traditional community of interest analysis in a hospital setting.

In *St. Vincent's Hospital v. N. L. R. B.*, 567 F.2d 588 (3d Cir. 1977), the court specifically rejected the Board's determination that four licensed boiler operators, members of the hospital maintenance department, constituted an appropriate separate bargaining unit. In denying enforcement of the Board's order, the court stated:

The Board seemingly was impressed by the facts that the boiler operators at St. Vincent's were licensed by the state, they spent most of their time in the boiler room where there was little contact with other hospital personnel and there was little interchange with other employees. The Board decided to apply traditional standards which recognize that licensed boilermen may constitute a separate appropriate unit.

The legislative history of the health care amendments, however, makes it quite clear that Congress directed the Board to apply a standard in this field that was not traditional. Proliferation of units in industrial settings has not been the subject of Congressional attention but fragmentation in the health care field has aroused legislative apprehension. The Board therefore should recognize that the contours of a bargaining unit in other industries do not follow the blueprint Congress desired in a hospital.

\* \* \* \* \* \*

[T]he factors of amount of contact between workers, separate immediate supervision, and the special skills of certain crafts must be put in balance against the public interest in preventing fragmentation in the health care field. A mechani-

cal reliance on traditional patterns based on licensing, supervision, skills and employee joint activity simply does not comply with congressional intent to treat this unique field in a special manner.

567 F.2d at 592.

*St. Vincent's* is remarkably similar to the situation in *Mary Thompson*. As evidenced in Part I, *supra*, the Board in this case relied solely on a traditional community of interest analysis in determining that four licensed stationary engineers were an appropriate bargaining unit. The regional director stated:

> I conclude the licensed stationary engineers are separately located, are required to be licensed, perform a highly specialized function, have minimal contact with the other non-professional employees of the Employer who are not represented by a labor organization and have different supervision from these employees.

*Mary Thompson Hospital*, No. 13–RC–14798 (N.L.R.B. Aug. 9, 1978) at 3. Clearly, this statement specifically contravenes the holding in *St. Vincent's* that a "mechanical reliance on traditional patterns based on licensing, supervision, skills and employee joint activity simply does not comply with congressional intent . . . ." See *St. Vincent's Hospital*, 567 F.2d at 592.

Since *St. Vincent's*, several more courts of appeals have reached the same result. Just two years ago, this court struck down a unit determination by the Board in *N. L. R. B. v. West Suburban Hospital*, 570 F.2d 213 (7th Cir. 1978). Holding that the Board had impermissibly applied only traditional community of interest standards in reaching its decision, the court concluded that twenty-one nonprofessional employees in West Suburban's maintenance department did not constitute an appropriate separate bargaining unit:

> Congress has made it clear that the Board must view evidence of traditional factors in the context of the stated Congressional policy of preventing proliferation of bargaining units in the health care field.

570 F.2d at 215. This court expressly admonished the Board for giving "mere lip-

service mention" of the congressional directive. See *id.* at 216.

Despite the clear language in *West Suburban*, the Board in this case has again failed to demonstrate how it considered the congressional mandate. In fact, the Board in this case did not even give "lip-service" to the directive; instead, except for a *pro forma* recitation of the Hospital's objection, it never addressed the issue at all. We find this flagrant omission by the Board to be fatal to its request for enforcement of its order.

More recently, both the Second and Third Circuit Courts of Appeals have reiterated a policy of strict adherence to the congressional requirement. In *N. L. R. B. v. Mercy Hospital Association*, 606 F.2d 22 (2d Cir. 1979), the court considered the propriety of the Board's determination that twenty-one maintenance department employees constituted an appropriate bargaining unit. Despite the strong judicial precedent requiring it to consider the congressional directive in all hospital unit determinations, the Board in *Mercy Hospital* did not even discuss it. In denying enforcement of the Board's order, the Second Circuit discussed the Board's argument that it had given sufficient deference to the congressional admonition by applying to proposed hospital bargaining units the same community of interest approach utilized in a unit determination in an industrial context:

> We disagree [with the Board's argument]. Our reading of the legislative history leads us to conclude that in the 1974 amendment Congress was expressing concern not only that health care institutions be spared the egregious unit proliferation of the construction trades but that less extreme unit fragmentation arising from the application of usual industrial unit criteria could also impede effective delivery of health care services.

*Mercy Hospital*, 606 F.2d at 27.

Two months after *Mercy Hospital*, in *Allegheny General Hospital v. N. L. R. B.*, 608 F.2d 965 (3d Cir. 1979), the Third Circuit repeated its reasoning from *St. Vincent's Hospital*. As had every other court of ap-

peals that had considered the issue, the *Allegheny* court denied enforcement of the Board's order requiring the hospital to bargain with a separate unit of sixty-six maintenance and housekeeping employees. The court stated:

> [The Board] relies on the same analysis it presented to this court when [previous] decisions were rendered. Thus, this is not a case in which the Board has attempted to follow precedent by demonstrating how the material facts in this case differ from the facts of the cases in which the rules were made. On the contrary, this is a most unusual circumstance in which a federal agency has refused to apply the law announced by the federal judiciary.

*Allegheny*, 608 F.2d at 968.

We believe the same situation to be present here. Indeed, the Board seems to ignore precedent from federal appellate courts in favor of its own interpretations of its own decisions. For example, in its brief in this court, the Board relegates to a footnote its discussion of this court's decision in *West Suburban Hospital.* See *Brief of the Board* at 27 n.31. And in that footnote, there is a glaring omission of this court's ruling that the Board *must* expressly consider the congressional admonition in making unit determinations and that the Board *must not* rely exclusively on a traditional community of interest analysis. See *West Suburban Hospital*, 570 F.2d at 215 & 216. Instead, the Board attempts factually to distinguish this case from *West Suburban*, basing that distinction on precisely the factors used in a traditional community of interest analysis. In a similar vein, the Board ignores in its brief any meaningful discussion of the Third Circuit's decision in *St. Vincent's Hospital.* Instead, in support of the statement that "[t]he Board has . . . found a separate unit of stationary engineers to be appropriate where the circumstances warrant in facilities like [Mary Thompson] Hospital," it cites its own decision in *St. Vincent's*, a decision deemed incorrect by the court of appeals which denied its enforcement. *Brief of the Board* at 12.

■ Such flagrant disregard of judicial precedent must not continue. Not only is the Board obligated under the principles of *stare decisis* to follow this court's decision in *West Suburban*, but it also owes deference to the other courts of appeals which have ruled on the issue.

■ Because of the Board's reliance on traditional community of interest standards and because the Board failed to consider the congressional admonition, we set aside and deny enforcement of its order.

ENFORCEMENT DENIED.

FAIRCHILD, Chief Judge, dissenting. With all respect to the judges who have decided this issue, in this circuit and others, I disagree.

The so-called "admonition" in the committee reports might well be given effect by a reviewing court if it aided in the interpretation of a provision of the statute, but that is not the situation presented.

The "admonition" is not part of the statute. Nor was there any change in the portion of the statute governing the Board's choice of an appropriate unit, so that the "admonition" would be helpful in interpreting the change.

Under the circumstances, the "admonition" and the Board's response to it seem to be a matter between the Board and Congress. If the Board may be thought by members of Congress to pay insufficient heed to the "admonition," the Board may be courting a statutory change. But it seems to me that the "admonition" is not appropriate for application by the courts in deciding whether an order of the Board conforms to the statute or whether the Board has abused the discretion conferred on it by statute.

This may be a purist approach to the source of statutory law, but so be it.