**NORTH SUBURBAN BLOOD CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–2273.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1981.

Decided Oct. 1, 1981.

James F. Hendricks, Jr., Oakbrook, Ill., for petitioner.

Steven Fetter, N.L.R.B., Washington, D.C., Joel A. D'Alba, Chicago, Ill., for respondent.

Before PELL and SPRECHER, Circuit Judges, and EAST,* Senior District Judge.

PELL, Circuit Judge.

North Suburban Blood Center (NSBC or Center) has petitioned this court, pursuant to 29 U.S.C. § 160(f), to review and set aside an order of the National Labor Relations Board (Board or NLRB) which determined that the Center had violated 29 U.S.C. §§ 158(a)(1) and (5) by refusing to bargain with the union certified as the collective bargaining representative of the petitioner's full and regular part-time distribution driver and dispatch employees,[1] and directed the Center to bargain with the union. The Board has cross-applied for enforcement of its order.

The union sought certification as the exclusive bargaining representative of NSBC's driver and dispatch employees pursuant to 29 U.S.C. § 159(c). At the representation hearing before the Board's Regional Director, the Center objected to this unit definition as contrary to a Congressional directive to avoid undue proliferation of bargaining units in health care institutions. The Regional Director rejected NSBC's contention and determined that the Center was not a health care institution under § 152(14) of the Act. On that basis, he refused to apply considerations regarding the proliferation of bargaining units and directed an election. Ultimately, after the election, the Regional Director certified the union as the exclusive bargaining representative of the Center's drivers and dispatchers. After the Center refused to bargain, the union filed the unfair labor practice charges here at issue. The sole question decided in this appeal is whether the North Suburban Blood Center is a health care institution within the meaning of 29 U.S.C. § 152(14).[2]

*The Nature of the Employer's Business*

The North Suburban Blood Center is a nonprofit entity formed by thirteen hospitals in Chicago's north and northwest suburbs to meet the total blood requirements of the participating hospitals. NSBC represents the consolidation of the internal blood bank operations of the hospitals which established the Center with their own funds to serve more efficiently and economically the blood needs of all of the hospitals jointly. Soon after NSBC was established, it was incorporated as a separate nonprofit organization, but it still retains organizational connections with the thirteen hospitals. The Center's Board of Directors is comprised of a hospital administrator or physician of each individual hospital, and a blood bank director or pathologist from each hospital serves on NSBC's Medical Advisory Board. The president and medical director of the Center is a physician licensed in Illinois and certified by the American Board of Pathology.

Donor recruiting and blood collection, processing, storage, inventory control, and distribution, previously performed separately by each hospital, are now consolidated into a unified operation carried out by the NSBC. The Center obtains blood from donors at its own facility located in Glenview, Illinois, at hospital facilities it uses,[3] or through exchange agreements with blood banks serving other hospitals. In addition to acquiring blood, the Center purchases blood-related supplies in bulk for the hospitals.

The Center maintains laboratories for testing, processing, and preparing blood at the Glenview facility. In addition, the Center's administrative vice-president, Dan

---

* William G. East, Senior District Judge for the District of Oregon, is sitting by designation.

1. The Board's Decision and Order is reported at 251 N.L.R.B. No. 98 (1980). This decision was based upon findings made by the Board's Regional Director in the prior representation hearing.

2. Because of our disposition of the case we need not address the disputed issue of the pro-

priety of the Board's inclusion of two on-call drivers in the bargaining unit.

3. Some of the hospitals have not retained any blood donor facilities on premises. Others maintain space for the Center's use, but NSBC provides its own equipment and staff. Still other hospitals use their own facilities and staff, but operate under the ultimate direction of the Center.

Connor, testified that NSBC operates a reference and consultation laboratory to which the hospitals can send problem cases when "they want to cross-match [blood] . . . and for whatever reason they have difficulty having the cross-matching compatible because the donor or the patient may have some irregular antibodies because of the previous transfusions. . . . [At the reference laboratory] we screen it against various known antiserums and then screen the donor for blood to come up with compatible blood for that patient that will not result in a transfusion reaction."

Other functions performed by the Center include diagnostic testing of patient specimens, consultation by the Center's Medical Director with physicians regarding particular patients, and the provision of blood and blood products for specific patients when requested by a physician from one of the hospitals. The Center can perform a plasma extraction procedure known as a "plasma freeze." [4] Center employees also draw blood from "autologous" donors—those who come to have blood drawn for their own use, such as persons with rare blood types whose blood is extracted for their own future surgery. In addition, some people come to the Center for "therapeutic phlebotomies," which involve the removal of excess red blood cells, at the order of their attending physicians. In these cases, the blood removed is not used for later transfusions. Such donors are really receiving

treatment as patients, although these treatments constitute a very small percentage of the Center's overall activity. Finally, NSBC's medical director treats any donors experiencing complications at the Center.

## Status of Health Care Institutions Under the Act

Prior to the 1974 amendments to the National Labor Relations Act (Act), nonprofit hospitals were explicitly exempted by § 152(2) from the Act's definition of "employers" subject to the Act's coverage. Although blood banks were not statutorily exempt from the Act, the Board occasionally had declined to assert jurisdiction over blood banks when it determined that the blood bank was "intimately related" to the patient care at the exempt hospitals. [5] In 1974, Congress removed the nonprofit hospital exemption from § 152(2) and added a new subsection 152(14), which reads: "The term 'health care institution' shall include any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged persons." Although nonprofit hospitals now are subject to the Act's coverage as health care institutions, a determination that an entity is a health care institution requires unions of those organizations to abide by particular provisions added to the Act in 1974 designed to minimize disruption of patient care services. [6]

4. This procedure involves extracting a person's blood, which is then centrifuged to separate the blood elements—white and red blood cells, plasma, and platelets. Depending upon the needs of the person, some portion of the blood is removed and the rest returned. The entire process consumes from one to three hours.

5. In *Inter-County Blood Banks, Inc.*, 165 N.L.R.B. 252 (1967), the Board declined to assert jurisdiction over a blood bank which primarily serviced nonprofit hospitals then exempt from the Act because it found, under the particular facts of the case, that the employer's operations were "intimately related to the operations of the hospitals to which it supplies blood for the treatment of patients. . . ." *Id.* at 253. There, the blood bank maintained 13 donor centers most of which were located in hospitals served by the blood bank. The hospitals supplied the space at no charge, but the blood

bank operated the donor centers with its own equipment and staff. In *American National Red Cross*, 211 N.L.R.B. 587 (1974), however, the Board asserted jurisdiction where the operation of the employer's blood program occurred off the hospitals' premises and served both exempt and nonexempt hospitals. The Board found that the employer's operations were unlike those found intimately connected with exempt hospitals in *Inter-County*. We express no opinion as to the appropriateness of such findings under prior law or under the 1974 amendments, but only cite these examples to illustrate the status of blood banks under Board decisions prior to the 1974 amendments to the Act.

6. A proviso to Section 158(d) pertaining to bargaining for a new contract where a previous contract is in effect but about to expire con-

Additionally, if the petitioner is found to be a health care institution, the Board must abide by a Congressional directive that

> Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the Committee notes with approval the recent Board decisions in *Four Seasons Nursing Center*, 208 NLRB No. 50, 85 LRRM 1093 (1974), and *Woodland Park Hospital*, 205 NLRB no. 144, 84 LRRM 1075 (1973), as well as the trend toward broader units enunciated in *Extendicare of West Virginia*, 203 NLRB No. 170, 83 LRRM 1242 (1973).[1]

---

[1] By our reference to *Extendicare*, we do not necessarily approve all of the holdings of that decision.

S.Rep.No.93–766, 93d Cong., 2d Sess. 5 (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 3946, 3950; H.Rep.No.93–1051, 93d Cong., 2d Sess. 7 (1974). *See, e. g., Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858 (7th Cir. 1980); *NLRB v. Mercy Hospital Association*, 606 F.2d 22 (2d Cir. 1979), *cert. denied*, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980); *NLRB v. West Suburban Hospital*, 570 F.2d 213 (7th Cir. 1978).

A major purpose of the 1974 amendments was to minimize "the potential for increased disruption of health care delivery resulting from increased labor activity by employees of health care institutions now that their activities were protected" by the Act. *NLRB v. IBEW*, 548 F.2d 704, 711 (7th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977).[7] In *NLRB v. St. Francis Hospital*, 601 F.2d 404, 411 (9th Cir. 1979), the Ninth Circuit acknowledged that

> In considering legislation to amend the Act, it was immediately recognized that the health care industry was unique and that disruptions caused by organizational drives and related activities at a hospital were a far more serious concern than at an industrial plant given the grave nature of medical care and the fact that "Hospital care is not storable." S.Rep. No.93–766, 93rd Cong., 2d Sess. 39 (1974), 2 [1974] U.S.Code Cong. & Admin.News, pp. 3946, 3953 (individual views of Sen. Dominick).

### The Board's Decision

 Although we would not approve the automatic denial of health care institution status to an employer merely because it was a blood bank, neither do we conversely read the Act as amended categorically to require that every blood bank be classified as a health care institution. The facts of each case will vary, and each case must be reviewed individually. The Board's findings in any case must be upheld if supported by substantial evidence. *American*

---

tains notice requirements which are increased by thirty days for health care institutions. This section also extends the period during which strikes and lockouts are prohibited by 30 additional days for health care institutions. Finally, when bargaining for an initial contract, parties to a dispute must participate in state and federal mediation services, and must give 30 days notice of the dispute to these services if a health care institution is involved.

Subsection 158(g) requires ten days notice to the institution and the Federal Mediation Service before strikes or picketing are allowed at a health care institution. Section 169 allows employees of such institutions to pay dues to nonreligious charitable funds in lieu of union dues if that person's religion "has historically held conscientious objections to joining or financially supporting labor organizations." Finally, § 183 allows the Director of the Federal Mediation Service to convene an impartial Board of Inquiry to assist in resolving labor dispute impasses involving health care institutions where "a threatened or actual strike or lockout ... [will] substantially interrupt the delivery of health care in the locality concerned. ..."

7. Rep. Erlenborn underlined Congress' concern for avoiding undue disruption of health care services.

> I think much credit is to be given to the House and Senate sponsors of the legislation this year in recognizing the unique situation of the health care industry and the damage that can occur to a community if there is an unwarranted interruption of the health care delivery services, particularly if that interruption comes without sufficient notice to accommodate the community by providing alternative health care delivery during the period of the strike.

120 Cong.Rec. 16,902 (1974).

*Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 894 (7th Cir. 1981). Under the facts of this case, we cannot uphold the Board's determination as supported by substantial evidence.

The Regional Director relied upon the authority of *Sacramento Medical Foundation Blood Bank*, 220 N.L.R.B. 904 (1975), and *San Diego Blood Bank*, 219 N.L.R.B. 116 (1975), to deny health care institution status to NSBC. *Sacramento Blood Bank* was an independent nonprofit corporation serving the blood requirements of approximately forty hospitals and health care institutions in the area. The Board's decision in that case did not reveal whether the blood bank performed any services beyond recruiting donors, testing, processing, and distributing blood. The Board's entire analysis of health care institution status in that case was a one-sentence footnote stating that "[w]e also rely on *San Diego Blood Bank, supra*, in finding that the Employer is not a health care institution within the meaning of the 1974 health care amendments (P.L. 93–360)." 220 N.L.R.B. at 904.[8]

In *San Diego Blood Bank*, 219 N.L.R.B. 116 (1975), the employer was an independent nonprofit corporation 80% of whose services supplied the blood needs of five nonprofit hospitals, and which overall served twenty-nine hospitals. As in *Sacramento Blood Bank*, the Board did not reveal whether the San Diego blood bank provided any services other than the recruiting of donors, and the processing and distribution of blood. In *San Diego*, the Board devoted a single paragraph to determining the health care institution issue:

> We also find that the Employer is not a health care institution within the meaning of the 1974 amendments. The legislative history makes it clear that the special provisions of the Act applicable to health care institutions relate to "patient care situations" and not "purely administrative health connected facilities." See 120 Cong.Rec. H4594 (daily ed., May 30, 1974); 120 Cong.Rec. S7310 (daily ed.,

May 7, 1974). Since supplying blood to hospitals obviously does not involve patient care, blood banks are not health care institutions within the meaning of the amendments.

219 N.L.R.B. at 116 n.17.

The parties have not cited, nor has this court found, any other Board cases which would shed more light on the issue, nor does it appear there are any Court of Appeals decisions determining the status of blood banks under the 1974 amendments.

The Regional Director's reliance, in the case at bar, on *Sacramento Medical Foundation Blood Bank* and *San Diego Blood Bank* is not compelling because (1) the record shows that the NSBC carried on activities beyond the recruitment of donors, processing, and distribution of blood, and (2) in any event, the Board's superficial analysis in those cases illustrates its disregard for Congress' concern to promote stability in patient care delivery through the 1974 amendments. While we recognize that Congress vested the Board with the responsibility for developing federal labor policy in the health care field, *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978), the Board cannot ignore Congressional intent. *See NLRB v. Mercy Hospital Association*, 606 F.2d 22, 24 (2d Cir. 1979), *cert. denied*, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980); *St. Vincent's Hospital v. NLRB*, 567 F.2d 588, 590 (3d Cir. 1977).

The legislative history indicates that the crucial factor in the definition of health care institutions is patient welfare:

> The scope of the application of the amendment is meant to include patient care situations and is not meant to include purely administrative health connected facilities. As an example, an insurance company specializing in medical coverage would not fall under the scope of these amendments, but would remain under general coverage of the act. An administrative facility or operation within a hospital, however, would be within

---

**8.** The Union cites *Greene County Chapter American Red Cross and Springfield Regional Red Cross Blood Center*, 221 N.L.R.B. 776 (1975), which similarly confines its analysis of health care status to a footnoted citation to *San Diego Blood Bank*. *Id.* at 776 n.3.

the scope of the amendments as there would be a connection directly and indirectly with ongoing patient care. The crucial connection is the welfare of the patients and such connection would in certain cases be mere geographical proximity to ongoing patient care.

120 Cong.Rec. 13,559 (1974) (remarks of Sen. Taft).

In the instant case, the Regional Director found that "no patient care occurs at the facility." He noted, for example, that the only persons who had participated in the "plasma freeze" procedure up to the time of the Board hearing had been staff members and not patients, and that although money had been set aside to establish an outpatient transfusion service for hemophiliacs, this program was not yet in operation. It is true that as of the date of the hearing, only staff members had actually participated in the plasma freeze procedure, but Dr. Farrales, the Center's Medical Director, also indicated that this process was evolving through its start-up phase: "[t]here have been freezes done at North Suburban where we did it on donors. We had donors from our staff. The machine has been purchased. The room has been set and so we are in the process of developing." The Regional Director ignored the existence of autologous donors who have blood extracted for their own future use. In oral argument, the Board characterized these people as healthy persons, not patients, and reasoned that in the event of a labor dispute, autologous donors could simply reschedule their blood extraction. Although rescheduling might ordinarily be possible, we can envision situations where the donor's operation has to be performed in the immediate future.

The Board's requirement that patient care physically occur *at* the Glenview facility, in any event, sidesteps the purpose of the Act's amendments. The legislative history indicates that geographical proximity

may convert a purely administrative facility into a health care facility if located *within* a hospital because then "there would be a connection directly and indirectly with ongoing patient care." 120 Cong.Rec. 13,559 (1974) (remarks of Sen. Taft). But the converse does not necessarily follow. The fact that NSBC is located apart from any one hospital, precisely because it is designed to serve thirteen hospitals, cannot *a fortiori* deprive it of health care institution status if the Center is in fact integrally related to patient care and not purely administrative. The fact that patients are not generally treated at the facility does not itself mean that the Center is purely administrative if in fact a disruption in services would seriously impair patient welfare, the central concern of the amendments.

We reject the Board's argument that the nature of a blood bank's services is analogous to those of pharmaceutical suppliers or hospital laundry services in that all these enterprises supply essential goods and services but do not provide "patient care." While a strike at a pharmaceutical supplier or laundry service could force a hospital to seek alternate sources of supply involving some inconvenience and possibly a greater price, a labor disruption at NSBC could have a much more serious impact since blood is a crucial commodity which may not always be as fungible as other items.[9] A steady supply of blood of the required types is absolutely crucial to patient welfare. The hospitals in this case maintain no significant independent stockpiles of blood. Moreover, as previously discussed, the Center in this case provides consultation and other services beyond the collection, processing, and distribution of blood. NSBC is a nonprofit organization which, in reality, is simply a consolidation of the separate blood banks of the thirteen hospitals, each of which is represented on the Center's Board of Directors. The blood services provided in this case logically deserve the greater

**9.** In the context of product liability law, for example, several states have recognized the unique nature of blood as a product and have acknowledged by legislation the critical need to assure patients an unimpeded blood supply. These states have declared the supply of blood

to be a service, and not a sale, in order to avoid strict liability for contaminated blood. *See, e. g., Cal. [Health & Safety] Code* § 1606 (West); Mich.Stats.Ann. § 14.15 (9121) [M.C.L.A. § 333.9121].

protections against labor disruption provided by Congress in the 1974 amendments.[10]

For the reasons expressed herein, the petition to set aside the Board's order is granted and the Board's cross-application for enforcement is denied. Because we find that the Center is a health care institution within the meaning of the Act, the Board must follow Congress' directive against the undue proliferation of bargaining units in the health care industry when considering the appropriate bargaining unit in any further proceedings. *Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858 (7th Cir. 1980).

PETITION TO SET ASIDE GRANTED; ENFORCEMENT DENIED.

---

**10.** Because we are addressing the wholly unique situation of blood services, we are not persuaded by the Board's comparison of NSBC with the laboratories in *Boston Medical Laboratory, Inc.*, 235 N.L.R.B. 1271, 1271 n.2 (1978), and *Damon Medical Laboratory, Inc.*, 234 N.L.R.B. 333, 334 n.1 (1978), where the Board found the testing of human medical specimens not to involve patient care for purposes of the 1974 amendments. *Boston Medical* relied upon *Damon* which, in turn, had based its ruling upon *San Diego Blood Bank* and *Sacramento Medical Foundation Blood Bank*, stating that laboratory operations are "analogous" to blood banks. While we would not consider such a glib comparison to be compelling, we express no opinion as to the propriety of the Board's findings in *Boston Medical* or *Damon*, or likewise, the similar findings in *Center for Laboratory Medicine*, 234 N.L.R.B. 387, 387 n.3 (1978), cited by the Union, in which the Board also relied upon *Damon*.