**Patrick H. HYATT; Herman O. Caudle and Mary P. Lovingood, on behalf of themselves and all others similarly situated, Plaintiffs,**

**and**

**North Carolina Department of Human Resources, Disability Determination Services, Plaintiff-Intervenor,**

**Margaret M. H**_____**, or her successors in office,** _____ **y of the United States Departn** _ **or Health and Human Services, Defendant.**

**No. C–C–83–655–M.**

United States District Court, D. North Carolina, Charlotte Division.

Feb. 14, 1984.

Jane Harper, Legal Services of Southern Piedmont, Inc., Charlotte, N.C., John Wester, Fleming, Robinson, Bradshaw & Hinson, Charlotte, N.C., for plaintiffs.

Jeffrey L. Bishop, Charlotte, N.C., for North Carolina Dept. of Human Resources.

Richard S. Poe, Asst. U.S. Atty., Charlotte, N.C., Jason Baron, U.S. Dept. of Human Services, Baltimore, Md., for defendant.

McMILLAN, District Judge.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION THAT THE UNITED STATES SECRETARY OF HEALTH AND HUMAN SERVICES SHOULD

(1) STOP *DENYING* CLAIMS FOR SOCIAL SECURITY DISABILITY BENEFITS BASED ON HYPERTENSION OR DIABETES MELLITUS UPON THE THEORY THAT WITHOUT END–ORGAN DAMAGE (TO HEART, EYES, KIDNEYS OR BRAIN) THE CLAIMANT DOES NOT HAVE A "SEVERE IMPAIRMENT"

(2) STOP *DENYING* CLAIMS FOR SOCIAL SECURITY DISABILITY BENEFITS BASED ON PAIN, UPON THE THEORY THAT SUBJECTIVE MANIFESTATIONS OF PAIN CANNOT BE CONSIDERED DISABLING UNLESS THEY ARE SUPPORTED BY OBJECTIVE CLINICAL FINDINGS

(3) STOP *TERMINATING* SOCIAL SECURITY BENEFITS WITHOUT SUBSTANTIAL EVIDENCE THAT THE RECIPIENT'S DISABILITY HAS CEASED

—ALL OF WHICH THE SECRETARY PERSISTS IN DOING, IN CONSCIOUS AND WILFUL DISREGARD OF PERTINENT AND CONTROLLING DECISIONS OF THE UNITED STATES COURT OF APPEALS FOR THE FOURTH JUDICIAL CIRCUIT OF THE UNITED STATES.

I N D E X

|  | PAGE |
|---|---|
| FINDINGS OF FACT | 988 |
| I. THE PARTIES AND THE ISSUES | 988 |
| II. CASE HISTORIES OF THE INDIVIDUAL PLAINTIFFS AND OTHERS |  |
| (a) Patrick H. Hyatt | 988 |
| (b) Herman O. Caudle | 990 |
| (c) Mary P. Lovingood | 991 |
| (d) Other Representative Class Members | 991 |
| III. HOW SOCIAL SECURITY CLAIMS ARE HANDLED; REVIEW AND TERMINATIONS, 1982–84 STYLE | 992 |
| Background | 992 |
| Procedure | 993 |
| Terminations | 994 |
| Irreparable Harm | 995 |
| The Moratorium | 995 |
| The Secretary's Position | 996 |
| CONCLUSIONS OF LAW | 996 |
| I. DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION | —— |
| II. THE SUBSTANTIVE LEGAL MERITS OF THE CASE | —— |
| DECISION | —— |

## FINDINGS OF FACT

### I.

### THE PARTIES AND THE ISSUES

1. This is a class action against the Secretary of the United States Department of Health and Human Services, challenging the policy of the Social Security Administration (SSA) denying Social Security benefits and terminating Social Security benefits, in the cases described below, in open violation of applicable decisions of the Fourth Circuit Court of Appeals.

2. The individual plaintiffs and class members are applicants for or former recipients of disability benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.;* 1381 *et seq.* The North Carolina Department of Human Resources, Disability Determination Services (DDS), has been authorized to intervene as a party plaintiff. *See, Nuesse v. Camp,* 385 F.2d 694 (D.C.Cir.1967); Fed.R.Civ.P. 24(a), (b).

3. Plaintiffs contend that the Secretary, acting pursuant to an express policy of refusal to comply with federal circuit court decisions with which she disagrees, has promulgated standards of eligibility for disability benefits which directly contradict controlling decisions of the Fourth Circuit Court of Appeals.

4. First, plaintiffs contend that the Secretary's regulation SSR 82–55 disregards the Fourth Circuit's holding in *Martin v. Secretary of Department of Health, Education and Welfare,* 492 F.2d 905 (4th Cir. 1974), by requiring that medical impairments such as diabetes mellitus and hypertension shall not be considered disabling unless they are accompanied by end-organ damage (*i.e.,* damage to heart, eyes, kidneys or brain).

5. Second, plaintiffs contend that the Secretary's regulation SSR 82–58 disregards the Fourth Circuit's holding in *Myers v. Califano,* 611 F.2d 980 (4th Cir.1980), by providing that subjective manifestations of pain shall under no circumstances be considered disabling unless they are substantiated by objective clinical findings.

6. Finally, plaintiffs contend that the Secretary's regulations SSR 82–49c and SSR 81–6 disregard the holding of *Dotson v. Schweiker,* 719 F.2d 80 (4th Cir.1983), by providing that a person currently receiving benefits is not entitled to a presumption of continuing disability, and may be found to be no longer disabled, despite the absence of evidence that the recipient's condition has changed for the better since the date when he or she was last determined to be disabled.

7. Plaintiffs have argued that SSA's policy of "non-acquiescence" is contrary to the Social Security Act; to the separation of powers doctrine; to principles of *res judicata, stare decisis,* and collateral estoppel; to the due process and equal protection guarantees of the Fifth Amendment to the United States Constitution; and to the Administrative Procedure Act. They seek both declaratory and injunctive relief requiring the Secretary to adhere to the decisions of the Fourth Circuit Court of Appeals in determining eligibility for Social Security disability payments.

8. Pursuant to specific orders of court dated December 16, 1983, and January 13, 1984, all issues were consolidated under Rule 65(a)(2), and the case was heard on January 18, 1984, on (1) defendant's motion to dismiss; (2) plaintiffs' motion for injunctive relief; (3) plaintiffs' motion for class certification; and (4) the merits of the case. The court received all competent evidence offered on all issues by all parties.

### II.

### CASE HISTORIES OF THE INDIVIDUAL PLAINTIFFS

#### (a) *Patrick H. Hyatt*

9. Plaintiff Patrick Hyatt is 47 years old, has a tenth grade education, and last worked in 1973 as a long haul truck driver. He lives in Mecklenburg County, North Carolina, with his wife and two daughters. Between 1969 and 1974 plaintiff underwent a series of back operations, including sever-

al lumbar laminectomies with removal of ruptured intervertebral discs. Since the time of his original surgery, plaintiff has suffered from continuous, disabling back and leg pain.

10. On January 7, 1974, plaintiff was found by the Social Security Administration to be disabled due to degenerative disc disease, post-lumbrosacral fusion problems, and depressive reaction. He received Social Security disability benefits from March, 1973, until September, 1981.

11. On September 10, 1981, DDS notified Hyatt that his disability had ceased during July, 1981; his benefits were terminated. DDS did not inform Hyatt that his condition had improved since he was last determined by SSA to be totally disabled. On October 5, 1981, plaintiff requested reconsideration of this decision. On January 8, 1982, after reconsideration, DDS upheld its original decision, informing Hyatt that although he suffered from "discomfort," he did not suffer from objective physical impairments that would prevent him from doing work activity.

12. On December 10, 1982, Mr. Hyatt received a hearing before a Social Security Administration administrative law judge (ALJ). At the hearing, plaintiff testified that his severe pain precluded him from engaging in even the slightest exertional activities; this evidence was substantiated by witnesses. In connection with the hearing, the ALJ received as evidence numerous reports rendered by plaintiff's regular treating physician, Dr. Jerry M. Petty, a neurosurgeon. Among his other findings, Dr. Petty stated that "Mr. Hyatt is totally and permanently disabled for any type work and has been for quite some time." Tr. 160. Dr. Petty's reports following Mr. Hyatt's frequent visits throughout the past ten years document Hyatt's continuing and severe pain.

13. The ALJ also considered a report made by Dr. Ronald C. Demas, to whom plaintiff was referred for a consultive examination by DDS. Dr. Demas diagnosed plaintiff as suffering from probable chronic low back strain, post laminectomy changes.

Tr. 148. Dr. Demas does not appear to have considered the disabling effects of plaintiff's subjectively experienced pain.

14. On January 7, 1983, the ALJ rendered his decision. He determined that plaintiff's back condition constituted a severe impairment, but stated that plaintiff retained the residual functional capacity to perform sedentary work. The ALJ did not accord plaintiff a presumption of continuing disability, and he did not make any finding whether plaintiff's condition had improved since he was last found disabled.

15. In his decision, the ALJ took notice of plaintiff's severe pain, but found that it was not disabling. The ALJ stated that Dr. Petty was "overly impressed with the claimant's complaints of pain," and stated that the job of SSA was to determine whether a claimant is disabled "on the basis of medical evidence and other findings." Tr. 23–24. The ALJ then proceeded to find that Hyatt's pain is not disabling when he limits his physical exertion. There is *no* evidence in the file to support this finding.

16. On June 2, 1983, the SSA Appeals Council denied review of the ALJ decision. Following that action, plaintiff instituted this suit to review the Secretary's final decision pursuant to 42 U.S.C. § 405(g).

17. At the trial, Mr. Hyatt testified that his disability benefits amounted to $425 per month before they were terminated. Since the payments were terminated, plaintiff has received no income for himself. He receives $202 per month in AFDC payments to provide support for his two children, and the family also receives food stamps. The family's monthly rent is $175.

18. Mr. Hyatt and his family have experienced severe financial distress since his benefits were terminated. Mr. Hyatt was forced to sell his home because he fell behind on the mortgage payments, and a number of his personal possessions, including an automobile and two chairs, have been repossessed by the finance company. Mr. Hyatt testified that he has fallen behind on a number of bills, including all the utility bills; the family has been unable to

buy clothing, or to afford a diet that includes meat.

### (b) *Herman O. Caudle*

19. Plaintiff Herman O. Caudle was 56 years old at the time this suit was filed. He had a 10th grade education, and had worked in the past as a salesclerk, night watchman, and maintenance man. Until the time of his death on October 24, 1983, Mr. Caudle lived with his wife in Winston-Salem, North Carolina.

20. SSA originally found that Mr. Caudle was entitled to a period of Social Security disability benefits beginning in May, 1981, due to hypertension, control less than satisfactory, with Grade II retinopathy, exogenous obesity, passive-dependent personality, and depressive reaction with sleep disorder. The evidence before the court established also that Mr. Caudle weighed about 270 pounds, and suffered for a period of years from hypertension which his doctors were unable to control through medication. Exh. 25, p. 4; Exh. 11, p. 1.

21. In March, 1983, DDS informed Mr. Caudle that his disability had ended. DDS affirmed its initial determination upon reconsideration. Plaintiff Caudle then requested a hearing before an ALJ. A hearing was held on August 17, 1983, and on August 24, 1983, the ALJ issued his decision that Mr. Caudle was no longer disabled because he did not suffer from a "severe impairment."

22. In reaching his decision, the ALJ did not accord Caudle a presumption of continuing disability, and did not make any finding that Caudle's condition had improved since he was last found by SSA to be disabled.

23. The ALJ found from the evidence before him that Caudle suffered from hypertension, under less than satisfactory control with Grade II–III retinopathy, but he found that Caudle suffered from no end-organ damage (*i.e.*, damage to eyes, heart, kidneys, or brain).

24. The ALJ further found that plaintiff's subjective complaints were not substantiated by objective clinical findings.

25. On October 21, 1983, Mr. Caudle filed a timely request with the Appeals Council for review of the ALJ's decision; three days later he was dead, apparently from the hypertension and other ailments which had disabled him for several years.

26. Counsel for plaintiffs introduced the affidavit of plaintiff Caudle's regular treating physician, Dr. Mary Fennell Lyles, assistant professor of internal medicine at Bowman Gray School of Medicine. Dr. Lyles, who treated Caudle from 1979 until his death in 1983, discussed the severity of Caudle's hypertension, which she stated showed no medical improvement, and in fact showed a progressive deterioration, despite a course of aggressive therapy. She also stated:

> "Anxiety, depression, and financial stress all further complicated management of Mr. Caudle's blood pressure. I attribute a large portion of this emotional distress to worry over his benefit status, especially since May of 1983." Exh. 11, p. 1.

27. Dr. Lyles further stated that Dr. Joyce Reynolds, medical examiner at Forsyth Memorial Hospital, had reported her opinion that Mr. Caudle had died a cardiac death as a complication of his hypertension. Dr. Lyles supported the finding of Dr. Reynolds with her own opinion that "Mr. Caudle's disabling condition, severe hypertension, led to aggravation of his angina and eventually to myocardial infarction which was the probable cause of death." Exh. 11, p. 2.

28. Dr. Lyles added that she had attempted to hospitalize Mr. Caudle before his death, to perform intensive diagnostic procedures. Mr. Caudle had refused hospitalization due to a lack of insurance coverage and the threatened loss of his disability benefits. Dr. Lyles concluded that her patient "did not receive optimal treatment because his benefits were cut off." Exh. 11, p. 3.

29. Counsel for plaintiffs also introduced the affidavit of Herman Caudle's widow, Mary Devers Caudle. Mrs. Caudle

stated in her affidavit that Mr. Caudle's physical condition had not improved, but instead had continued to decline, from the time when he was originally awarded disability benefits. Additionally, she stated, Mr. Caudle grew very worried and upset about the termination of his benefits, spending more and more time alone in his room, and causing Mrs. Caudle great concern. Mrs. Caudle stated her belief that "worrying about Social Security shortened Herman's life." Exh. 10, p. 2.

### (c) *Mary P. Lovingood*

30. Plaintiff Mary Lovingood is 57 years old, and cannot read or write. In the past she worked as a pie maker and a poultry cleaner. She lives with her husband in Charlotte, North Carolina.

31. SSA originally found that Ms. Lovingood was disabled due to chest pain, high blood pressure, and back and leg pain. Lovingood received Social Security disability benefits from 1974 until October, 1983. Her benefits were terminated pursuant to a notice by DDS in August, 1983, that she was no longer disabled.

32. In the explanation accompanying the notice of termination sent to Ms. Lovingood, DDS stated:

"Although you may have pain in your back and legs at times, the report show [sic] that you are able to stand, walk, and use your legs in a normal manner."

The explanation further stated:

"Although your blood pressure is higher than normal, it has not damaged your heart, kidneys or eyes [end-organs]."

Exh. 25, p. 2.

33. DDS did not accord Ms. Lovingood a presumption of continuing disability based on her prior entitlement to benefits, nor did it make any finding that her condition had improved since she was initially found to be disabled.

34. On September 1, 1983, Ms. Lovingood requested reconsideration of the DDS decision and her request was denied. She then filed a request for a hearing before an ALJ on October 15, 1983. Apparently, that request is still pending.

35. Ms. Lovingood's affidavit was received in evidence. In her affidavit, plaintiff states that her condition has *not* improved since SSA originally found that she was disabled. In addition, Ms. Lovingood states that she has grown anxious and depressed since learning that her disability benefits would be terminated. The termination of Ms. Lovingood's benefits reduced her family income by approximately 30 per cent; she and her husband now live on his income of $530 per month, and will experience difficulty in paying the costs of their food, rent, utilities, insurance, and medical bills. Ms. Lovingood did not elect to continue receiving her disability payments pending appeal of her case to an ALJ, because she was afraid she would be unable to repay SSA if she ultimately lost her case.

### (d) *Other Representative Class Members*

36. Affidavits of several declarants were received in evidence. From these affidavits and other evidence, the court finds the following facts:

37. SSA has engaged in a consistent practice of terminating Social Security disability benefits without making any finding that a recipient's condition has improved since he or she was originally determined to be disabled. Exhs. 8–24.

38. The loss of Social Security benefits often causes former recipients to suffer severe financial hardship. Many former recipients have become completely dependent on others, such as the public welfare system, private charities, or their children, for support. Still others have suffered the loss of their homes (Exh. 16); their utilities (Exh. 19); or their automobiles (Exh. 13).

39. The termination of benefits to disabled persons whose conditions have not changed has often resulted in the inability of these persons to secure proper medical treatment for the very conditions from which they are disabled, or other conditions. Exh. 20 (claimant in debt for medicine); Exh. 14 (inability to purchase medicine); Exh. 13 (appointments with private treating physician no longer affordable);

Exhs. 14, 16 (eye examinations and glasses not affordable); Exh. 21 (needed dental treatments cancelled).

40. Persons whose disability benefits are terminated without any demonstration that their conditions have improved often experience deep emotional distress due to resultant financial pressures, which tends only to aggravate the severity of their physical or emotional disabilities. Exhs. 17–20; 23.

41. On several known occasions, former recipients of disability benefits have died, shortly after their benefits were terminated without any showing of improvement, from the very conditions which SSA had determined were not disabling severe impairments. Exhs. 15, 17, 18, 24.

### III.

### HOW SOCIAL SECURITY CLAIMS ARE HANDLED; REVIEWS AND TERMINATIONS, 1982–84 STYLE.

#### Background

42. Title II of the Social Security Act provides for disability insurance benefits (SSDI) for disabled workers. 42 U.S.C. § 401 *et seq.* SSDI benefits are based upon an individual's earnings record and are paid without regard to financial need. Title XVI of the Social Security Act provides for supplemental income (SSI) for persons who are both poor and disabled. 42 U.S.C. § 1381 *et seq.* SSI benefits are paid to eligible poor persons whose income and resources fall below a certain level.

43. The *disability* standards for both the SSDI and SSI programs are identical. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 42 U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A).

44. The Social Security Administration (SSA), pursuant to contract, has entrusted initial disability determinations to the North Carolina Department of Human Resources, Disability Determination Services (DDS). In making disability determinations, DDS, the state agency, follows, and is only authorized to follow, disability standards promulgated by the federal agency, SSA. These standards are established by directives in the Programs Operation Manual System (POMS) utilized by DDS employees, and in various SSA rulings (SSRs) and policy statements.

45. An initial claimant for disability benefits will be referred to DDS, the state agency, for review. If the claim is denied, the claimant may request reconsideration by DDS. If the claim is still denied, the claimant may request a hearing before a federal SSA Administrative Law Judge (ALJ). A claimant who receives an adverse decision from an ALJ may appeal the decision to the SSA Appeals Council. Finally, a claimant who is denied benefits by the Appeals Council may seek relief from that decision by suing in federal court. 42 U.S.C. § 405(g).

46. A claimant who is found disabled at any stage of this procedure is entitled to benefits. However, a person is eligible for benefits only as long as the disability continues. A recipient of disability benefits is subject to a "continuing disability investigation" (CDI) at least once every three years. 42 U.S.C. § 421(h)(1).

47. The procedure for review of eligibility for benefits and possible termination is essentially similar to the procedure followed in initial applications for benefits. *See* 20 C.F.R. § 404.900 *et seq.;* § 416.901 *et seq.* A recipient is contacted by DDS and told that his or her case is being reviewed to determine whether he or she is still disabled. If DDS determines that the recipient is no longer disabled, DDS sends the recipient a letter informing him or her of the determination; SSA terminates payments of benefits shortly thereafter. A recipient may request reconsideration from DDS, and may seek further review of a termination of benefits from (in turn) an ALJ, the Appeals Council, and the federal

courts. (An SSI recipient need not seek reconsideration from DDS, but instead may appeal directly to an ALJ.)

48. Persons whose benefits have been terminated are currently offered the option of continuing to receive benefits pending appeal at the ALJ level. 42 U.S.C.A. § 423(g)(1) (West Supp.1983) ("aid paid pending" program). However, if the ALJ affirms the termination, all benefit payments are terminated, and the benefits paid pending appeal may be considered overpayments subject to recoupment by the Secretary of Health and Human Services.

*Procedure*

49. The Secretary develops guidelines for substantive disability determinations. These guidelines are published as Social Security regulations, 20 C.F.R. § 400 *et seq.;* Social Security rulings (SSRs); and Programs Operating Manual Systems (POMS). They are used as a controlling reference by DDS (state) and SSA (federal) employees who perform disability evaluations upon claimants.

50. Under the contract between the SSA and North Carolina, the North Carolina Department of Human Resources, Disability Determination Services, makes initial disability determinations both for new applicants and for those recipients whose continuing disability status is reviewed. The state employees are controlled by the federal regulations in making disability determinations and may not vary from them. If, for example, a DDS consulting physician expresses the opinion that a claimant is disabled, that opinion will be rejected by the state and federal examiners unless the medical impairments fit precisely within the guidelines established by the defendant.

51. SSA and DDS employees who evaluate claims for disability payments are charged with the duty of determining whether a claimant suffers from a "severe impairment" which limits the claimant's ability to engage in, or wholly prevents a claimant from engaging in, substantial gainful activity.

52. SSA has published SSR 82–55, which is the same document as POM 2107. These documents are entitled, "Medical Impairments That Are Not Severe." According to these documents SSA has determined that the following impairments are not "severe," and thus not disabling:

¶ 4a. Hypertension without significant organ damage, past or present.

¶ 7.[a]. Diabetes mellitus, adult onset, controlled on prescribed therapy, without significant end-organ damage or recent episodes of acidosis.

These regulations are codified in 20 C.F.R. Subpart P, Appendix 1, § 4.00 C, which states:

*Hypertensive vascular disease* does not result in severe impairment unless it causes severe damage to one or more of four end-organs: heart, brain, kidneys, or eyes (retinae).

53. DDS employees who evaluate the condition of disability claimants automatically determine that individuals who suffer from hypertension or diabetes mellitus are not disabled from those illnesses, unless those individuals also suffer from clinically substantiated end-organ damage. In such cases, DDS employees do not make any attempt to determine an individual's actual ability to perform work.

54. The Secretary offered no evidence to indicate that either diabetes mellitus or hypertension is not disabling unless it has already resulted in end-organ damage.

55. Carl Young, Supervisor of the Quality Assurance Unit of DDS, testified at the trial and submitted an affidavit which supports his testimony. Mr. Young supervised an evaluation of a random sample of 407 cases closed by DDS in late December, 1983. The closed cases included those of original applicants whose claims for benefits were denied, and cases of former recipients whose benefits were terminated. From this evaluation, Mr. Young determined that 15 percent of all denials in the sample involved either hypertension or diabetes mellitus without any significant end-organ damage. From all the testimony,

the court finds that a substantial number of persons in North Carolina have been denied a complete evaluation of their actual ability to perform substantial gainful activity, solely because their illnesses have not yet resulted in significant damage to their eyes, kidneys, hearts or brains.

56. Symptoms, including pain, must be strictly judged by a guideline (SSR 82–58 and POM 2205) entitled "Evaluation of Symptoms":

"POLICY STATEMENT: *Symptoms will not have a significant effect on a disability determination or decision unless medical signs or findings show that a medical condition is present that could reasonably be expected to produce the symptoms which are alleged or reported.* However, once such a medical condition (e.g., disc disease) is objectively established, the symptoms are still not controlling for purposes of evaluating disability. *Clinical and laboratory data and a well-documented medical history must establish findings which may reasonably account for the symptom in a particular impairment.*

Objective clinical findings which can be used to draw reasonable conclusions about the validity of the intensity and persistence of the symptom and about its effect on the individual's work capacity must be present. For example, in cases of back pain associated with disc disease, typical associated findings are muscle spasm, sensory loss, motor loss, and atrophy. There must be an objective basis to support the overall evaluation of impairment severity. *It is not sufficient to merely establish a diagnosis or a source for the symptom.*" [Emphasis added.]

57. DDS employees who evaluate the condition of disability claimants do not consider subjective claims of pain which seem to them to be disproportionate to the clinical medical evidence before them. These employees disregard statements by the individual being evaluated concerning the severity or intensity of his or her pain, unless those statements are supported by objective clinical findings.

58. Dr. George M. Cooper, a medical consultant for DDS, testified—and the court finds—that chronic severe pain may limit a claimant's functional capacity to a greater extent than would be indicated by objective clinical findings alone. An evaluating physician may be convinced, on the basis of his or her professional judgment and an analysis of all the evidence, that a claimant is totally disabled, yet the physician may be required by the Secretary's regulations to find the claimant not disabled due to a lack of objective clinical findings to support the claimant's complaints of pain.

59. Carl Young (see ¶ 55, above) further testified that 16.4 percent of all the denials of benefits evaluated by his office in late December, 1983, involved claims of significant pain, the intensity of which was not supported by objective clinical findings. From this testimony the court finds that a significant number of persons in North Carolina have been denied a complete evaluation of their actual ability to engage in substantial gainful activity solely because their subjective complaints of pain, no matter how severe or disabling, were not fully supported by objective clinical findings.

### Terminations

60. The Secretary has admitted, in SSRs 81–6, 82–64 and 82–49c, and through testimony in this court, that she does not comply with the mandate of the Fourth Circuit in *Dotson v. Schweiker,* 719 F.2d 80 (4th Cir.1983), and that SSA continues to terminate disability benefits without any demonstration that the recipient's condition has improved since the time that he or she was originally found disabled.

61. Since October 5, 1981, in North Carolina, DDS has adjudicated approximately 165,000 claims, of which approximately 99,-000 were denials or terminations. During 1983, prior to September 7, 1983, DDS had terminated the Social Security disability benefits of approximately 106 North Carolinians per week. The total number of

terminations since October 15, 1981, is approximately 15,000.

62. Aileen Webster, witness for the plaintiffs, testified. She also filed an affidavit which contains the substance of her oral testimony. That affidavit is as follows:

I, Aileen Webster, being duly sworn, aver and say:

1. I have been employed by Disability Determination Services ("DDS") for the past 18 years, serving as a disability specialist, a supervisor and, for the last five years, as a section chief.

2. In connection with my duties as Section Chief, I directed a review of the files of those 821 recipients who, as of approximately November 1, 1983, would have been terminated for medical reasons but for the moratorium. Specifically, I instructed supervisors to review the medical evidence available at the time each such claim was initially allowed and the medical evidence currently available with respect to each such claim and to determine, using common sense guidelines, whether there had been any medical improvement. On the basis of that review, the supervisors reported to me that *60.2% of the recipients who would be terminated for medical reasons under the present guidelines had not experienced any medical improvement in their condition.* [Emphasis added.]

This 12 day of January, 1984.

/s/ Aileen Webster

63. The court finds the facts to be as the above evidence tends to show: Large numbers (whether 60.2% or somewhat more or less) of the persons undergoing review of disability under the Secretary's present guidelines are being cut off the Social Security rolls without evidence that their conditions have improved and without any presumption that their disabilities continue. Those persons would continue to draw benefits if the Secretary were following relevant decisions of the Fourth Circuit Court of Appeals.

### Irreparable Harm

64. The termination and the unjustified denial of Social Security disability benefits cause irreparable harm to eligible persons. Many become unable to pay for medicines, clothing, food, fuel, transportation and shelter. Termination and denial of benefits cause anxiety, depression and decline in health. Some former recipients have died following termination of benefits; posthumous reinstatement after appeal doesn't help them.

65. If the Social Security Administration were to provide DDS with the files of disability claimants who reside in North Carolina, DDS employees would be able to determine by reviewing the files whether they showed (a) hypertension or diabetes mellitus without significant end-organ damage; (b) a subjective claim of disabling pain unsupported by objective clinical medical findings; or (c) a termination of benefits without any evidence that a claimant's condition had improved since he or she was last found disabled. The court is satisfied from the evidence that the work and expense necessary to locate and reevaluate the files of those affected will produce no serious hardship upon the state or federal administrators.

### The Moratorium

66. On September 7, 1983, James M. Hunt, Jr., the Governor of North Carolina, was sufficiently concerned about the terminations of disability benefits payments in North Carolina that he issued Executive Order No. 97 entitled "Moratorium on Terminating Social Security Disability Benefits." Temporarily, such terminations have ceased.

67. In addition, the Social Security Administration on December 7, 1983, ordered a nationwide temporary halt of terminations of benefits due to Congress' failure to extend certain provisions of section 2, P.L. 97–455, which has expired. Nevertheless, in both North Carolina and the rest of the nation, disability termination *decisions* are still being made at a rapid rate; the temporary nationwide halt only relates to *notifi-*

*cations to individuals* that their eligibility for benefits has ceased. Benefits are still being paid to those who are considered no longer eligible, but those payments could be terminated any day at the discretion of the Governor or the Secretary. Moreover, North Carolina residents whose benefits were terminated pursuant to SSA's policies *prior to September 7, 1983,* are not eligible to receive benefits under the Governor's order, and the cases of others who have filed claims to have their benefits restored are currently wending their way through the lengthy DDS and SSA appeals process.

### The Secretary's Position

68. The Secretary of HHS accepts the decision of no court short of the Supreme Court as precedent binding on her. She views decisions of the United States circuit courts and district courts as binding only on the litigants involved in a case, and not as precedent which she must follow in other similar cases. When a conflict arises between the decisions of lower courts and the opinions of the Secretary, the Secretary considers herself entitled to follow her own interpretations of the Social Security Act rather than those rendered by lower courts.

69. The Secretary has instructed all administrative law judges handling Social Security disability cases to make "reasonable efforts" to follow district or circuit court decisions regarding *procedural* or *evidentiary* matters. However, SSA has instructed its ALJs that when district court or circuit court decisions *interpreting the Act, Social Security regulations, or SSA rulings* conflict with the Secretary's interpretations, the ALJs should not consider these court decisions binding in future cases and should not cite such lower court decisions in their opinions. ALJ decisions relying on federal case law are often reversed by the SSA Appeals Council for that reason. ALJs have been informed that "the federal courts do not run SSA's programs." Associate Comm'r., Office of Hearings and Appeals, *Memorandum to Administrative Law Judges* (January 7, 1982).

70. The Secretary's refusal to comply with court decisions with which she disagrees is a continuing policy from which SSA deviates only by publishing new regulations and rulings that conform to judicial precedent. 1–161, *SSA Precedents.*

## CONCLUSIONS OF LAW

### I. DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION.

71. Defendant has moved to dismiss the complaints with respect to all named and class plaintiffs except Mr. Hyatt, on grounds that the court lacks subject matter jurisdiction over the actions with respect to these claims. Defendant relies on 42 U.S.C. § 405(g), which provides in pertinent part:

> "Any *individual,* after any *final decision* of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." [Emphasis added.]

72. Despite its literal language, the relief afforded by this statute is not confined to individual Social Security claimants who file individual suits in district courts. The Supreme Court has held that § 405(g) provides an appropriate jurisdictional basis for claims challenging the constitutionality of provisions of the Social Security Act. *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). The Court has also held that this statute provides jurisdiction over a claim challenging SSA's procedures. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Finally, the Court has held that § 405(g) permits federal courts to entertain class actions and to grant injunctive relief. *Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

73. Defendant claims that only plaintiff Hyatt has received a "final decision" of the Secretary which this court has the authority to review under the statute, in that his is the only claim that has been presented to the SSA Appeals Council for review. The "final decision" requirement of § 405(g) consists of two elements. The first element, which is purely jurisdictional in the sense that it cannot be waived, is the requirement that a claim for benefits shall have been presented to the Secretary. The second element, which can be waived either overtly or constructively by the Secretary, is the requirement that the administrative remedies be exhausted. *Mathews v. Eldridge*, 424 U.S. at 328, 96 S.Ct. at 899; *Weinberger v. Salfi*, 422 U.S. at 763–64, 95 S.Ct. at 2465–66; *Aldrich v. Schweiker*, 555 F.Supp. 1080, 1087 (D.Vt.1982).

74. The first, non-waivable, element of the finality requirement of § 405(g) has been satisfied with respect to the claims of all the named and proposed class plaintiffs. The named plaintiffs have all presented claims for benefits to the Secretary. The class as proposed includes only those claimants who (a) have presented initial claims for benefits or who, (b) by joining in the proposed class or otherwise, will have notified the Secretary that they believe their benefits should not be terminated. *See*, *Mathews v. Eldridge, supra*, 424 U.S. at 323–24, 329, 96 S.Ct. at 897–98, 900 (jurisdictional requirement satisfied by answering state agency questionnaire, and by writing letter in response to tentative determination of disability cessation); *Mathews v. Diaz*, 426 U.S. 67, 75, 96 S.Ct. 1883, 1889, 48 L.Ed.2d 478 (1976) (claim filed with Secretary by Espinosa, *after* he had joined in District Court suit, satisfied jurisdictional requirement); *Kennedy v. Harris*, 87 F.R.D. 372, 376 (S.D.Cal.1980) (mere termination of benefits fulfills requirement of presenting a claim).

75. The Secretary's claim that only she may waive the § 405(g) formal prerequisite to suit was rejected by the Supreme Court when it stated:

*Salfi* suggested that under § 405(g) the power to determine when finality has occurred ordinarily rests with the Secretary since ultimate responsibility for the integrity of the administrative program is [hers]. But cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate."

*Mathews v. Eldridge*, 424 U.S. at 330, 96 S.Ct. at 900.

76. In *Mathews v. Eldridge*, the Supreme Court established a method for determining whether a court may infer waiver of the Social Security Act's exhaustion requirement. First, a court may infer waiver when the plaintiff's claim is entirely collateral to his individual claim for benefits. 424 U.S. at 330–31, 96 S.Ct. at 900–01. Further, the exhaustion requirement may be deemed waived when the damages upon which a plaintiff's claim for relief is based are of such a nature that he cannot adequately be compensated by the relief that would accrue from a judicial proceeding following exhaustion. *Id.* at 331, 96 S.Ct. at 900. Finally, federal courts have held that exhaustion may be inferred when the Secretary's position with respect to the litigant's claim is so fixed that further pursuit of administrative remedies would be futile. *Weinberger v. Salfi, supra*, 422 U.S. at 767, 95 S.Ct. at 2467; *Liberty Alliance of the Blind v. Califano*, 568 F.2d 333, 345 (3d Cir.1977).

77. Plaintiffs have satisfied all the above tests for waiver, and have provided additional reasons why the Social Security Act's exhaustion requirement should be waived. First, and most significantly, plaintiffs' claims in this case are not confined to direct claims for the payment of benefits. Instead, plaintiffs seek to affect the procedures by which the Secretary determines eligibility for benefits. Of course, plaintiffs' claims are generated from a belief that benefits would be awarded to them if SSA were to apply lawful standards to the review of their cases. Nevertheless, that fact does not convert their suit into a

direct claim for benefits, in which the court would be asked to review the record of each individual case to determine whether the Secretary's decision is supported by substantial evidence. In *Mathews v. Eldridge, supra,* the Supreme Court held that a plaintiff's due process claim to a pre-deprivation hearing was collateral to a substantive claim for benefits. 424 U.S. at 330, 96 S.Ct. at 900. That the plaintiff in *Eldridge* hoped ultimately to have his benefits reinstated did not affect the court's decision concerning the essential nature of his claim.

78. *Smith v. Schweiker,* 709 F.2d 777 (2d Cir.1983), relied on by the Secretary, does not affect this decision. In *Smith,* a panel of the Second Circuit Court of Appeals determined that a claim concerning the Secretary's application of a medical improvement standard, similar to a claim made in this case, was not collateral to the plaintiffs' substantive claims for benefits. In rejecting the plaintiffs' argument that exhaustion of the claim could be inferred, the court stated:

"Exhaustion, moreover, would frame the issue in a much clearer fashion than is possible when it is posed as an abstraction. While the legal issue raised by plaintiffs may seem well-defined to them, it seems rather unformulated to us. What is meant by evidence of medical improvement, for example, is somewhat ambiguous."

709 F.2d at 780.

79. Unlike the abstract claims presented to the Second Circuit panel in *Smith,* the claims raised by plaintiffs in this case are all-too-sadly concrete. Plaintiffs here challenge the Secretary's refusal to follow three well-reasoned opinions by the Fourth Circuit Court of Appeals which this court is bound to follow. Where a legal standard has been clearly enunciated, this court is authorized, and indeed required, to determine whether the Secretary's posture with regard to that standard comports with the constitutional principles of separation of powers and due process. In addition, in this case, the court has received in evidence numerous documents from which this court as factfinder can decipher the Secretary's questioned policies which are systematically applied to all claims for benefits.

80. The plaintiffs have further demonstrated that the harm they suffer cannot adequately be relieved by individual judicial review following complete administrative exhaustion of their claims. The Secretary has argued that whatever harm plaintiffs may suffer from a possible misapplication of the law to their cases will be compensated by the ultimate retroactive payment of benefits upon successful litigation in federal court. This claim overlooks several serious aspects of plaintiffs' situation.

81. First, as plaintiff Hyatt testified at the trial of this case, termination of disability benefits means for many of the members of plaintiffs' class the difference between existence at a bare subsistence level, and the ability to pay the utility bills to keep warm in freezing temperatures, or to purchase an occasional item of clothing or piece of meat. Even more seriously, the evidence reveals that many persons whose disability benefits are terminated lose the ability to pay for desperately needed medications and health care. Indeed, many former recipients (some of whose benefits were later reinstated on appeal) attested to the severe physical and mental stress occasioned by the termination itself. In some cases, this severe stress was closely followed by death. No amount of retroactive benefits can compensate for years of deprivation and anxiety—which may even ultimately result in death—resulting from the Secretary's wrongful practices. Another reason that retroactive benefits are not fully compensatory is that one-quarter of the amount ultimately awarded following district court litigation is often paid, pursuant to 42 U.S.C. § 406(b)(1), to the lawyer who successfully represents the claimant in federal court.

82. Finally, the Secretary's argument overlooks the fact that the only claimants who will be retroactively compensated for the Secretary's application of an unlawful standard of review are those "with the

temerity to request ... review." *Aldrich v. Schweiker*, 555 F.Supp. 1080, 1088 (D.Vt. 1982), *quoting, Spear v. Harris*, No. 80143, slip. op. at 7 (D.Vt. July 31, 1980). The possibility of the application of a double standard to members of a group of potential disability payment recipients who are similarly situated provides further necessity for an inference of waiver. *See Rivera v. Heckler*, 568 F.Supp. 235, 242 (D.N.J. 1983).

83. This case adequately questions and attacks the legality of the Secretary's rulings and guidelines for the determination of eligibility for benefits. To require each plaintiff to exhaust her administrative remedies would serve no useful purpose. *Weinberger v. Salfi, supra*, 422 U.S. at 767, 95 S.Ct. at 2467.

84. Although the Secretary insists that her challenged rulings fit within the letter of the law, she has made no representation that they are subject to change at any time in the near future. The particular rulings in question, then, represent the Secretary's fixed position, to which the court has no doubt that the Secretary would adhere in reviewing each individual, substantive claim for benefits.

85. A requirement of exhaustion in this case would be the mere enforcement of formality, and a waste of administrative and judicial resources. *See, Kuehner v. Schweiker*, 717 F.2d 813, 817–818 (3d Cir. 1983); *Graham v. Heckler*, 573 F.Supp. 1573, 1577–78 (N.D.W.Va.1983). It would only add hardship to hardship.

## II. THE SUBSTANTIVE LEGAL MERITS OF THE CASE

86. The principle of separation of powers embodied in the United States Constitution is that federal courts retain the ultimate authority to interpret the law. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

87. Decisions of the Fourth Circuit Court of Appeals interpreting the Social Security Act are binding upon the Social Security Administration when it decides claims of people who live within the territorial jurisdiction of this circuit. *See, PPG Industries, Inc. v. N.L.R.B.*, 671 F.2d 817, 823 n. 9 (4th Cir.1982). (The NLRB, a federal adjudicative agency, was required to determine unfair labor practice cases arising within the circuit in accordance with the decisions of the Court of Appeals interpreting the National Labor Relations Act.)

88. In reaching its decision in *PPG Industries*, the Fourth Circuit expressed the position that has been adopted by the great majority of circuit courts addressing the question of an agency's refusal to follow the law of the circuit in which it functions. *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983); *Ithaca College v. NLRB*, 623 F.2d 224 (2d Cir.1980); *Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858 (7th Cir. 1980); *Allegheny General Hospital v. NLRB*, 608 F.2d 965 (3d Cir.1979); *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1252 (5th Cir.1978). *But see, Yellow Taxi Company of Minneapolis v. NLRB*, 721 F.2d 366 (D.C.Cir.1983) (NLRB not required to conform its rulings to every decision by court of appeals, but when law has been firmly established, Board is required to give court great deference). As the Court stated in *Allegheny Hospital, supra:*

> A decision by this court, not overruled by the United States Supreme Court, is a decision of the court of last resort in this federal judicial district. Thus our judgments ... are binding on all inferior courts and litigants in the Third Judicial District, and also on administrative agencies when they deal with matters pertaining thereto ... [T]he Board is not a court nor is it equal to this court in matters of statutory interpretation. Thus, a disagreement by the NLRB with a decision of this court is simply an academic exercise that possesses no authoritative effect ... For the Board to predicate an order on its disagreement with this court's interpretation of a statute is for it to operate outside the law.

608 F.2d at 970, *quoted in Ithaca College v. NLRB, supra*, 623 F.2d at 228–29.

89. The law of this Circuit is that the Secretary may *not* require end-organ damage as an exclusive precondition to the establishment of a disability from hypertension or diabetes. *Martin v. Secretary of Dept. of Health, Ed. & Welf.*, 492 F.2d 905 (4th Cir.1974). In *Martin*, the Fourth Circuit found that neither medical evidence nor the Social Security Act required a finding that a person is not disabled from hypertension or diabetes simply because he has not yet experienced end-organ damage.

■ 90. The Secretary's regulations SSR 82–55 and POM 2107 directly contravene the law of the Fourth Circuit by mandating that disability claimants who suffer from hypertension or diabetes must conclusively be found not disabled unless they exhibit significant end-organ damage.

91. SSA operated outside the law of this circuit by evaluating the disability status of plaintiffs Herman Caudle and Mary Lovingood according to regulations which dictate that claimants who suffer from diabetes or hypertension, but who have not yet experienced any end-organ damage, are conclusively deemed not disabled from either of those two conditions.

92. The law of this Circuit requires the Secretary to evaluate the disabling effects of a disability claimant's pain even though the intensity of the pain is shown *only by subjective evidence*. *Myers v. Califano*, 611 F.2d 980 (4th Cir.1980). In *Myers*, the Fourth Circuit reversed a denial of disability benefits which had rested on an SSA regulation requiring that impairments "must be demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at 983.

■ 93. The Secretary's regulations SSR 82–58 and POM 2205 directly contravene the law of the Fourth Circuit by mandating that symptoms will not have a significant effect on a disability determination unless they are supported by objective clinical findings.

94. The fact that the Secretary's regulations may have changed since the time of the *Myers* decision makes no difference for purposes of this analysis; the current regulations are as repugnant to the law as the regulation evaluated in *Myers*. In *Myers*, the court found that the claimant had established a sufficient case of disability in that the intensity of her pain, which was substantiated only by subjective evidence, "had a specific physical cause." *Id.* The Secretary's regulation expressly contradicts the holding of *Myers*, as it states: "It is not sufficient to merely [sic] establish a diagnosis or a source for the symptom."

95. SSA expressly refused to follow the law of this Circuit, in evaluating the disability status of plaintiffs Patrick Hyatt and Mary Lovingood, when it failed to consider the disabling effects of the pain experienced by these plaintiffs notwithstanding the fact that such pain was not supported by objective clinical findings.

■ 96. In *Dotson v. Schweiker*, 719 F.2d 80 (4th Cir.1983), *reh. denied* (4th Cir. Jan. 11, 1984), the Fourth Circuit, following the Administrative Procedure Act and applying a "familiar principle" of the presumptive continuing validity of judicial and administrative decisions, held that a previous determination of disability gives rise to a presumption that a claimant is still disabled. In order to rebut this presumption and justify termination of benefits, the Secretary is required to come forward with evidence that a claimant's condition has improved since the last disability determination. The rule adopted by the Fourth Circuit in *Dotson* has been applied by every federal court which has directly considered the standards applicable to the termination of disability benefits. *Patti v. Schweiker*, 669 F.2d 582 (9th Cir.1982); *Kuzmin v. Schweiker*, 714 F.2d 1233 (3d Cir.1983); *Simpson v. Schweiker*, 691 F.2d 966 (11th Cir.1982); *Doe v. Heckler*, 576 F.Supp. 463, No. M–83–2218 (D.Md. Dec. 13, 1983); *Graham v. Heckler*, 573 F.Supp. 1573 (N.D.W.Va.1983); *Trujillo v. Schweiker*, 558 F.Supp. 1058 (D.Colo.1983).

97. Since *Dotson* did not invent, nor claim to invent, any new rule of law, defendant's claim that it should not apply to pre-*Dotson* claims has no merit.

98. As she admits, the Secretary continues to determine, without any showing that the recipients' conditions have improved, that persons receiving benefits are no longer disabled. Thus the Secretary has explicitly chosen to disregard the law of the Fourth Circuit with respect to terminations of benefits.

99. Following her own regulations, and in direct contravention of the law of this Circuit, the Secretary terminated the disability benefits of plaintiffs Patrick Hyatt, Herman Caudle, and Mary Lovingood without any evidence that the condition of these plaintiffs had improved.

100. The Secretary contends that the Fourth Circuit's decision in *Dotson* is not binding law until the time for appeal has run on that case. No authority is cited to support this proposition. *This court* is bound by decisions of the Fourth Circuit Court of Appeals from the day they are issued; hence, in this case, the court is bound to apply the law as it stands in this circuit. As the Second Circuit stated in a similar case:

> "When [the NLRB] disagrees in a particular case, it should seek review in the Supreme Court. During the interim before it has sought review or while review is still pending, it would be reasonable for the Board to stay its proceedings in another case that arguably falls within the precedent of the first one. However, the Board cannot, as it did here, choose to ignore the decision as if it had no force or effect. Absent reversal, that decision is the law which the Board must follow."

*Ithaca College v. NLRB, supra,* at 228.

101. The Secretary has shown the court that she is abiding by the *Dotson* decision with respect to Dotson, the individual plaintiff in that case (who is now deceased); that she has not decided whether to appeal that case; and that she is currently appealing another case in the Fourth Circuit which raises the identical issues decided by the court in *Dotson.* These actions, the Secretary contends, show "awareness and respect" for the Fourth Circuit's opinion in *Dotson.* Sec'y's Supplemental Memo. of Points and Authorities in Oppos. to Plaintiffs' Motions for Prelim. Inj. and Class Cert., 12.

102. The Secretary's position concerning the *Dotson* decision can hardly be characterized as "respectful." Respect for the law means *obeying* the law. In taking the position that the *Dotson* decision need not be followed by her, the Secretary has *disobeyed* the law of this Circuit.

103. This court can understand why the Secretary might choose to appeal this issue in a case other than Dotson's; Dotson died, shortly after the Fourth Circuit's decision was rendered, from the very condition which the Secretary contended was not disabling. However, the Secretary may not continue an unlawful practice while she pursues, in an unrelated case, the issues conclusively determined by *Dotson.* Such a position, if accepted by a court, would allow the Secretary forever to escape the mandates of the law by abandoning appeals *before* a case reaches the Supreme Court for decision, but continuing to assert that she is litigating the issue by defending claims that have only freshly entered the federal court system.

104. A cabinet member is not above the law of the land, but is obligated to follow it. The Secretary is free to argue her position in any case she chooses, but, absent express authority from Congress or the federal courts, she can not offer an appeal in a newly-filed and unrelated case as an excuse to evade the law in *this* case.

105. The Secretary finally contends that her right to disregard decisions of the Fourth Circuit Court of Appeals has recently been confirmed by the Supreme Court in its opinion in *United States v. Mendoza,* —— U.S. ——, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). In *Mendoza,* a unanimous Supreme Court held that the government cannot be collaterally estopped from *relitigating* a constitutional issue adjudicated against it at the district court level in a different lawsuit brought by a different party.

106. In *Mendoza,* a United States district court in California *refused to hear the*

*merits* of a defense raised by the government to a due process claim arising out of the Nationality Act of 1940. The court's reason for refusing to hear the merits of the government's defense was a prior decision unfavorable to the government rendered in a similar case by a different California United States district court. The Supreme Court held that nonmutual collateral estoppel may not lie against the government in such a case.

107. *Mendoza* is not in point. The pertinent holding of *Mendoza* was only that the government must be allowed to challenge a law in court on its merits, *not* that an officer of the government may disobey court decisions with which he or she disagrees. This court has not refused to hear the merits of anything defendant wanted to present; on the contrary it has proceeded to the merits without unnecessary delay, and has heard everything defendants had to offer. The plaintiffs have claimed that the Secretary does not follow the law of the Fourth Circuit, and have cited authority, squarely in point, to support this claim. The Secretary has asserted that she *does* follow the law of the Circuit or, that where she does not follow it, she is not required to. The Court has considered the Secretary's case, has searched for its merits, and finds none.

108. Plaintiffs say (brief in support of injunctive relief, pp. 8–10) that their rights to "procedural due process" have been denied. Defendant responded in a footnote. Procedural due process does appear to be a valid additional basis of decision. *See Mathews v. Eldridge,* 424 U.S. 319, 322, 96 S.Ct. 893, 896, 47 L.Ed.2d 18 (1976) (interest in continued receipt of disability benefits is a property interest protected by the Fifth Amendment); *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) (conclusion of agency as to eligibility for welfare benefits must rest upon legal rules and evidence presented at a hearing). I have always been puzzled as to how much one clarifies the concept of due *process* of law ("that process which is due") by calling that *process* "procedural." Moreover, the quest for procedural due process in this context leads inevitably for its identification back to the cases of *Myers, Martin* and *Dotson.* Therefore, although "procedural due process" is an additional valid basis for this decision, I will not add more to what has already been written.

## DECISION

Plaintiffs have established a clear entitlement to have their claims for disability benefits reviewed pursuant to procedures that comport with the controlling decisions of this circuit interpreting the Social Security Act. The court will order relief consistent with this decision.

## JUDGMENT

Pursuant to the findings of fact and conclusions of law previously entered, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. Defendant's motion to dismiss the action for lack of jurisdiction is DENIED.

2. Plaintiffs' motion for certification of a class is ALLOWED. The procedure for defining and notifying the class and instituting class action proceedings is being set out in a separate order.

IT IS HEREBY FURTHER ORDERED that the Secretary of Health and Human Services is restrained and enjoined:

1. To cease immediately her policy of refusing to follow the law of the Fourth Circuit in implementing the Social Security Act in North Carolina.

2. To begin immediately to follow the law of the Fourth Circuit within North Carolina as it is expressed in *Martin v. Secretary of Health, Education and Welfare,* 492 F.2d 905 (4th Cir.1974), *Myers v. Califano,* 611 F.2d 980 (4th Cir.1980), and *Dotson v. Schweiker,* 719 F.2d 80 (4th Cir. 1983), and to issue written directives to SSA and DDS officials and other persons responsible for the administration of Social Security disability programs in North Carolina, ordering such persons to follow Fourth Circuit standards.

3. Within thirty (30) days from the date of entry of this judgment, to provide the North Carolina Department of Human Resources, Disability Determination Services, with sufficient information with regard to disability claims to enable DDS to identify the persons who may be entitled to relief under this judgment.

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED:

1. The case of plaintiff Hyatt is remanded for reconsideration by the Secretary in light of the findings of fact and conclusions of law previously entered.

2. A class action order will be entered.

3. Defendant shall provide plaintiffs access to the claims files sufficient to enable them to verify compliance with this judgment.

4. The Secretary shall pay to the North Carolina Department of Human Resources, Disability Determination Services, any costs incurred by DDS in implementing the terms of this judgment.

5. Defendant shall pay to plaintiffs' counsel their costs and reasonable attorneys' fees and expenses incurred in this case.

### ORDER TO COUNSEL

The court has just entered a judgment accompanied by findings of fact and conclusions of law. It is necessary for appropriate relief under that judgment that a class be certified of persons eligible for relief. Accompanying this order is a preliminary draft of a possible order certifying a class.

Counsel for all parties are directed to meet and discuss this draft of a class order, and to advise the court, in writing (jointly, if possible), within two weeks from today, by delivering to the court either (a) a class action order, in writing, acceptable to all sides, or (b) a paperwriting which states the portions of the order which are agreeable to all sides and which states separately all points of contention, if any, among the parties with regard to the contents of the class action order. This should include drafts of provisions for such an order which are acceptable to each side.

Counsel are directed to prepare, through the same process, a complete draft of a notice to the class, and to present this at the same time.

Counsel are further directed to consider the propriety of including in the notice to the class a paragraph reading, more or less, as follows:

CLASS MEMBERS AS HEREIN DEFINED WILL NOT BE ENTITLED TO ANY BENEFITS THAT MAY BE AWARDED UNLESS THEY

1) HAVE ALREADY FILED OR LATER FILE A TIMELY CLAIM OR APPEAL, OR

2) SEND IN A CLAIM IN ·RESPONSE TO THE CLASS ACTION NOTICE IN THIS CASE.

Upon receipt of the above-required communications, the court will either enter a class action order or schedule an immediate conference with counsel to resolve any remaining questions.

IT IS SO ORDERED, this 14 day of February, 1984.

### DRAFT ORDER CERTIFYING A CLASS

Pursuant to the findings of fact, conclusions of law and judgment previously entered, the class is defined as follows:

(a) All North Carolina residents who, since September 10, 1981, have applied for disability benefits (SSI or SSDI benefits) under the Social Security Act and whose claims were denied, either in an initial determination or another level of the administrative appeal procedure, because:

(i) the Secretary or DDS relied upon an absence or lack of end-organ damage, current or past, as determining that the claimant's hypertension and/or diabetes mellitus were not severe impairments; or

(ii) the Secretary or DDS relied upon an absence or lack of clinical findings as determining that the claimant's pain was not disabling; and

(b) All North Carolina residents whose benefits under the statute have, since September 10, 1981, been terminated or are subject to being terminated by the Secretary or DDS on grounds that they were not disabled under the Act for one or both of the reasons noted above in (i) and (ii); and

(c) All North Carolina residents whose Social Security disability benefits have, since October 6, 1982, been terminated or are subject to being terminated on grounds that the recipients were not disabled under the Act, without a finding that, since the Secretary's first determination of disability as defined in the Act, there has been improvement in their medical condition sufficient that they are no longer disabled.

The court finds that the class meets the requirements for certification of a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(2):

1. The class is so numerous (many thousands of claimants whose benefits have been terminated or whose applications have been denied) that joinder of all members is impracticable.

2. The claims of the members of the class as defined above present substantial common questions of law and fact. The claims have one significant and all-important feature of commonality, in that it is the *procedures* under which the determinations are made (*i.e.*, in disregard of controlling court decisions) which all potential claimants are entitled to attack.

3. The claims of class representatives Hyatt, Caudle and Lovingood are typical of the claims of the class members.

4. The court finds that the named class representatives will fairly and adequately represent and protect the interests of the class.

5. The defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

6. The exhaustion requirements of 42 U.S.C. § 405(g) are met; the class includes only those persons who have presented or will have presented, in appropriate fashion, within the appropriate time limits, claims for benefits which come within the claims specified in the class designations.

7. The date of September 10, 1981 in paragraphs (a) and (b) is chosen because that is the date on which class representative Hyatt was notified that his disability had ceased, and on which he first became eligible to file a claim for reconsideration. Class members should be entitled to participate in this action as if they had filed claims on or since the date Hyatt became eligible to file a claim.

8. The date of October 6, 1982, is chosen for the beginning date of the group described in paragraph (c) because that date is one year before the decision of the Fourth Circuit Court of Appeals in *Dotson v. Schweiker*, 719 F.2d 80 (4th Cir.1983). *See* 20 C.F.R. § 404.988 and § 416.1488 (Secretary may reopen disability cases up to one year following final determination).

[DRAFT ORDER ONLY; NOT SIGNED.]